(137 P.3d 1035)
No. 95,509

In the Interest of E.T.

Opinion filed July 7, 2006.

*Rex L. Lane*, of Atchison, for appellant natural father.

*Robert D. Campbell*, of Campbell Law Office, P.A., of Atchison, for appellant natural mother.

*Gerald R. Kuckelman,* county attorney, and *Phill Kline,* attorney general, for appellee.

Before PIERRON, P.J., GREEN and JOHNSON, JJ.

GREEN, J.: T.M., the natural mother, and M.T., the natural father, appeal from the trial court's decision terminating their parental rights in E.T. (date of birth 10-10-04). First, T.M. and M.T. contend that the trial court lacked jurisdiction over E.T. under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA). We disagree. Although it appears that Missouri had jurisdiction under K.S.A. 38-1348(a)(2), the Missouri court declined to exercise jurisdiction on the ground that Kansas was the more appropriate forum. Therefore, a Kansas court could assume jurisdiction under K.S.A. 38-1348(a)(3).

Next, T.M. contends that the trial court erred in ruling that there was a presumption of unfitness under K.S.A. 38-1585(a)(1) and (3) and terminating her parental rights. Based on the evidence presented by the State at the termination hearing, we determine that the presumption of unfitness was a K.S.A. 60-414(b) presumption that was rebutted by T.M.'s evidence. Therefore, the State still had the burden to prove T.M.'s unfitness by clear and convincing evidence. Because the State failed to meet its burden at the termination hearing, we reverse the trial court's decision terminating T.M.'s parental rights. Nevertheless, we determine that T.M.'s abusive conduct towards E.T.'s older sibling in 1996, coupled with the previous terminations of her parental rights in three children, furnished substantial competent evidence to support the trial court's determination that E.T. was a child in need of care.

Finally, M.T. argues that the trial court erred in determining that he was presumptively unfit under K.S.A. 38-1585(a)(3) and terminating his parental rights. We determine that the evidence presented at the termination hearing was insufficient to establish a presumption of unfitness under K.S.A. 38-1585(a)(3). Moreover, based upon the trial court's findings, we determine that there was not substantial evidence supporting the trial court's decision that M.T. was an unfit parent. Accordingly, we affirm in part, reverse in part, and remand.

In October 2004, T.M. gave birth to E.T. 3 months prematurely at St. Luke's Hospital in Kansas City, Missouri. When E.T. was born, both T.M. and M.T. were living in Kansas. E.T. suffered many complications due to his premature birth and remained in the hospital until the middle of January 2005.

On January 4, 2005, the State of Missouri initiated proceedings concerning E.T.'s protection. Following a protective custody hearing, the Missouri court entered orders placing E.T. in the temporary legal custody of its children's division. On January 16, 2005, E.T. was discharged from St. Luke's Hospital to licensed foster parents in Gladstone, Missouri.

On January 18, 2005, the State of Kansas filed a petition in the current case requesting that the trial court find E.T. a child in need of care. Moreover, the State requested that the trial court find T.M. and M.T. unfit parents and terminate their parental rights. The State's petition was based upon an April 1996 incident in which T.M. had slit her 3-year-old daughter's throat. T.M. was later convicted of aggravated battery for the injury to her daughter. Previous to this case, child in need of care adjudication and termination of parental rights actions were completed against T.M. involving her three other children. The State contended that there was a presumption of unfitness under K.S.A. 38-1585(a)(1) and (3) based upon the prior child in need of care adjudications and termination of parental rights. Moreover, the State contended that factors under K.S.A. 38-1583(b)(2) and (5) had been met due to T.M.'s conduct of slitting her daughter's throat and her later conviction. Regarding M.T., the State alleged that he had been convicted of several felonies and served time in prison and that J.T., a child in his custody, had been adjudicated a child in need of care.

T.M. had been convicted of the aggravated battery offense in 1997 and sentenced to 48 months in prison. Based upon her conduct and resulting conviction, T.M.'s parental rights were terminated in J.M. and B.M. in July 2000. After T.M. was released from prison, she and M.T. had a child, J.T. (date of birth 08-20-02). M.T. was not the father of J.M. and B.M.

After J.T. was born, child in need of care proceedings were initiated in Missouri based on the 1996 incident of T.M. cutting her

daughter's throat and her resulting conviction. J.T. was placed in protective custody. In February 2004, T.M. voluntarily relinquished her parental rights in J.T. Thereafter, M.T. achieved reunification efforts, and J.T. was returned to his care. Nevertheless, M.T. continued a relationship with T.M. and allowed contact between T.M. and J.T.

In December 2004, J.T. was removed from M.T.'s care and placed in the custody of his paternal grandparents. In a written stipulation filed with the Missouri court, M.T. agreed that J.T. would be placed in the custody of his paternal grandmother. Moreover, the paternal grandmother agreed to petition the probate court for guardianship over J.T.

After the State filed its petition in the instant case, T.M. moved to dismiss for lack of jurisdiction, arguing that Missouri was E.T.'s home state. At an evidentiary hearing conducted in January 2005 on her motion to dismiss, T.M. testified that she had recently moved to Missouri but that M.T. was still living in Atchison, Kansas. T.M. indicated that she had moved to Atchison before the petition was filed in this case. Nevertheless, the State presented testimony from a social worker who had spoken with T.M. on January 19, 2005. T.M. had advised her that she was in the process of moving to Missouri at that time but did not have a residence yet.

During the evidentiary hearing on T.M.'s motion to dismiss, the State introduced an order from the Missouri court dismissing the proceedings concerning E.T. in Missouri. The Missouri court found that Missouri was not E.T.'s "home state," that it was an inconvenient forum, and that it was appropriate for Kansas to establish jurisdiction over E.T.

At the conclusion of the hearing, the trial court found that both T.M. and M.T. resided in Kansas when E.T. was born and when the petition was filed in this case. The trial court determined that it had jurisdiction over the case and denied T.M.'s motion to dismiss. The trial court entered temporary orders, placing E.T. in the custody of the Secretary of Social and Rehabilitation Services and allowing him to remain in his current foster home placement in Gladstone, Missouri. T.M. was allowed frequent supervised visits with E.T. T.M. did not contest these temporary orders.

The record on appeal indicates that in February 2005, E.T. was placed in a foster home in Kansas for 3 days. Nevertheless, due to his medical condition, E.T. left his foster home placement in Kansas and was admitted to Children's Mercy Hospital in Kansas City, Missouri, for over a month. When E.T. was discharged from the hospital in April 2005, he went to a foster home in Kansas. In October 2005, E.T. was placed in Missouri with his paternal grandmother, who also had custody of J.T.

The hearing on the State's petition requesting that E.T. be adjudicated a child in need of care and that T.M. and M.T.'s parental rights be terminated was conducted on 2 days during March and April 2005. At the hearing, the State presented testimony from social worker Mary Ann Noll who had investigated the case when E.T. was born. Noll had written to the county attorney asking for protection for E.T. due to T.M.'s background. Noll indicated that she did not have any personal knowledge concerning T.M.'s ability to care for E.T. Noll stated, however, that T.M. visited E.T. frequently in the hospital and that T.M. had visited E.T. after he was discharged from the hospital.

During Noll's testimony, the State presented exhibits concerning the prior aggravated battery conviction of T.M.; the adjudication of J.M., B.M., and J.T. as children in need of care; and the termination of her parental rights in J.M., B.M., and J.T. The State also presented exhibits showing that M.T. had been convicted and imprisoned for attempted burglary in Missouri and that J.T. had been removed from M.T.'s custody. After Noll's testimony and the introduction of these exhibits, the State rested.

T.M. presented testimony from social worker Kristen Prekopy. She worked for the Atchison Kaw Valley Center. The center, which was a subcontractor for Kansas Social and Rehabilitation Services, had been monitoring E.T.'s placements and health progress. Prekopy testified that although she was not present during the hospital visitations between T.M. and E.T., she was told by the hospital social workers that the visitation guidelines were being followed. Moreover, in supervising the visits at E.T.'s foster home, Prekopy noticed that T.M. and M.T. had appropriate interactions with E.T. Prekopy was not aware of any mistreatment of E.T. by T.M or M.T.

T.M. also presented testimony from James Lewis, a family friend who had witnessed the interaction between J.T. and his parents when J.T. lived with them. Lewis testified that both T.M. and M.T. were good with J.T. According to Lewis, T.M. was a good mother who kept J.T. and her home clean, showed love and affection towards J.T., and provided J.T. with adequate clothing and food. Lewis never saw signs of abuse of J.T. According to Lewis, M.T. and J.T. had lived with Lewis for approximately 4 months. During that time, he noticed that M.T. was very attentive to J.T., showed love and affection towards him, and adequately cared for him. Lewis testified that he had never seen M.T. act inappropriately towards J.T.

Lewis stated that he had known M.T. for 12 years and had seen a drastic turnaround in him over that period of time. During his testimony, M.T. admitted that he had previously been convicted of burglary, tampering with a vehicle, and attempting to escape from police custody. He further admitted that he had served time in prison but had been released in 1999. M.T. testified that he had never been arrested for or convicted of a crime involving children, nor had the State ever alleged that he had abused a child.

Christine Deware, who was J.T.'s babysitter until December 2004, testified that T.M. was a loving and nurturing mother. Deware testified that she never suspected that T.M. was abusing J.T. J.T. was always clothed properly and was brought to her with adequate food, diapers, and other necessary supplies. Deware further testified that M.T. was very loving with J.T. and that J.T. was always happy to see his parents when they arrived to pick him up. According to Deware, she had no concerns about M.T.'s and T.M.'s parenting ability.

T.M. testified that she had voluntarily relinquished parental rights to J.T. because she was presumed unfit under a Missouri statute because of the prior termination of her parental rights in J.M. and B.M. According to T.M., she was never accused of doing anything improper to J.T. While J.T. lived with her, T.M. cared for him properly. T.M. testified that she had previously been treated for depression and anxiety which were due to her conviction for aggravated battery and the termination of her parental rights. Nev-

ertheless, T.M. indicated that she was psychologically able to take care of E.T. T.M. testified that while she was pregnant with E.T., she followed her doctor's advice. After E.T. was born, T.M. visited him in the hospital at least every 3 days during the first month. After the first month, she was at the hospital every other day for the entire day visiting E.T. During her visits with E.T., T.M. had observed M.T. being a good father and interacting with E.T. T.M. indicated that both she and M.T. had the skills necessary to be good parents. According to T.M., she would be willing to do anything it took to obtain custody of E.T.

T.M. also presented testimony from her mother, her father, and her brother who all had observed T.M. with her children. These family members indicated that T.M. was a good mother and that they had never seen any signs of abuse. Moreover, they indicated that M.T. was a good father. Moreover, T.M.'s brother indicated that M.T. had matured a lot since J.T. was born and that he was a loving father towards both J.T. and M.T.

After the hearing, Marlin Johanning, the appointed guardian ad litem, filed a document entitled "Guardian Ad Litem's Concurrent Pleading" in which he advised the trial court that he believed there was insufficient evidence to terminate T.M.'s and M.T.'s parental rights in E.T. Johanning pointed out that "an extremely important evidentiary component" was missing: an expert-witness counselor who could offer enlightenment as to the likelihood of T.M. having been fully rehabilitated so that she would never again be physically abusive towards her own child.

In October 2005, the trial court filed a written journal entry of judgment, adjudicating E.T. a child in need of care and terminating T.M.'s and M.T.'s parental rights. The trial court found that T.M. was presumed to be unfit under K.S.A. 38-1585(a)(1) and (3) because of having been found an unfit parent on three previous occasions and because on two or more occasions a child in her physical custody had been adjudicated a child in need of care. In addition, the trial court found that T.M. had met numerous factors under K.S.A. 38-1583 indicating T.M. was an unfit parent and her condition was unlikely to change in the foreseeable future. The trial court stated that T.M. had physically abused a child in her

care by slitting the child's throat, which resulted in her being convicted of a felony and imprisoned. The trial court found that M.T. was presumed to be unfit under K.S.A. 38-1585(a)(3) due to the fact that a child in his physical custody had been adjudicated a child in need of care. Moreover, the trial court found that M.T. had met numerous factors under K.S.A. 38-1583 indicating that he was an unfit parent and his condition was unlikely to change in the foreseeable future. The trial court stated that M.T. had been convicted of attempted burglary, a felony, and had been imprisoned.

*Jurisdiction*

First, T.M. and M.T. argue that the trial court lacked jurisdiction over this case under the UCCJEA. An appellate court's review of jurisdictional issues is unlimited. *McNabb v. McNabb*, 31 Kan. App. 2d 398, 403, 65 P.3d 1068 (2003). Moreover, resolution of this issue requires interpretation of K.S.A. 38-1348 of the UCCJEA. Interpretation of a statute presents a question of law over which an appellate court's review is unlimited. *In re Marriage of Ruth*, 32 Kan. App. 2d 416, 420, 83 P.3d 1248, *rev. denied* 278 Kan. 845 (2004).

The UCCJEA applies to proceedings held under the Kansas Code for the Care of Children, K.S.A. 38-1501 *et seq.*, K.S.A. 2005 Supp. 38-1503(a) and (b). K.S.A. 38-1348 of the UCCJEA sets forth four alternatives through which a Kansas trial court obtains jurisdiction to make an initial child-custody determination:

"(a) Except as otherwise provided in K.S.A. 38-1351 and amendments thereto, a court of this state has jurisdiction to make an initial child-custody determination only if:

(1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state;

(2) a court of another state does not have jurisdiction under paragraph (1), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under K.S.A. 38-1354 or 38-1355 and amendments thereto, and:

(A) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and

(B) substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships;

(3) all courts having jurisdiction under paragraph (1) or (2) have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under K.S.A. 38-1354 or 38-1355 and amendments thereto; or

(4) no court of any other state would have jurisdiction under the criteria specified in paragraph (1), (2), or (3)."

Here, the Missouri court declined to exercise jurisdiction over the case, finding that E.T.'s "physical location in the State of Missouri was temporary in nature and for the purpose of obtaining necessary medical care and treatment" and that Kansas was the "home state" of E.T.

Under K.S.A. 38-1348(a)(1), a Kansas court has jurisdiction if Kansas was E.T.'s home state when the proceeding was commenced or was E.T.'s home state within 6 months before the proceeding was commenced and E.T. was absent from Kansas but a parent or person acting as a parent continued to live here. K.S.A. 38-1337(8) defines "home state" as follows:

" 'Home state' means the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding. In the case of a child less than six months of age, the term means the state in which the child lived from birth with any of the persons mentioned. A period of temporary absence of any of the mentioned persons is part of the period."

Because E.T. was less than 6 months of age when the petition was filed in this case, his "home state" was the state in which he lived from birth with a parent or a person acting as a parent.

Both T.M. and M.T. contend that Kansas does not meet the definition of "home state" for E.T. because E.T. never lived in Kansas before the petition was filed in this case. On the other hand, the State maintains that E.T. was a resident of Kansas because T.M. had intended to bring E.T. to live in Kansas after his release from the hospital. Nevertheless, the State fails to cite any authority to support its proposition. Moreover, when the petition was filed in this case, Missouri had already entered protective orders placing E.T. in the temporary legal custody of its children's division. T.M. and M.T. were living in Kansas, and E.T. was living in Missouri

with foster parents. E.T. had not lived from birth in either Kansas or Missouri with a parent or a person acting as a parent. E.T. apparently did not have a "home state" on January 18, 2005, the date of the commencement of this case.

Because Kansas does not qualify as E.T.'s "home state" under K.S.A. 38-1348(a)(1), we must look to the other subsections of K.S.A. 38-1348 to determine whether Kansas has jurisdiction in this case. Under K.S.A. 38-1348(a)(2), when no other state has "home state" jurisdiction under K.S.A. 38-1348(a)(1), Kansas can exercise jurisdiction as long as two factors are met: (A) E.T. and at least one of his parents have a significant connection with Kansas, other than mere physical presence; and (B) substantial evidence is available in Kansas concerning E.T.'s care, protection, training, and personal relationships. Both factors must be met under K.S.A. 38-1348(a)(2) in order for Kansas to exercise jurisdiction.

T.M. and M.T. contend that Kansas does not have jurisdiction under K.S.A. 38-1348(a)(2) because E.T. had no significant connection with Kansas. We agree. While T.M. was pregnant with E.T., she received her prenatal care in St. Joseph, Missouri. E.T. was born in Missouri and spent several months in a Missouri hospital after his birth. When the petition was filed in this case and when the hearing was held on T.M.'s motion to dismiss for lack of jurisdiction, E.T. was living in Missouri with foster parents. At that time, E.T. had never been in Kansas.

In *In re Adoption of Baby Girl B.*, 19 Kan. App. 2d 283, 867 P.2d 1074, *rev. denied* 255 Kan. 1001 (1994), this court had to determine whether the child and her mother had a "significant connection" with Kansas under K.S.A. 38-1303(a)(2) (now repealed). K.S.A. 38-1303(a)(2) was a provision under the UCCJA which, similar to K.S.A. 38-1348(a)(2), required that the child and at least one parent have a "significant connection" with Kansas. In that case, approximately 2 weeks before the child's birth, the mother moved to Kansas to live with her uncle who became her legal guardian. Before moving to Kansas, the mother and the child's father lived in Pennsylvania with their respective parents. The day after the child's birth, the adoptive petitioners, who lived in Michigan, petitioned for adoption. The adoptive petitioners were

granted temporary custody, and the child lived with them in Michigan after her discharge from the hospital. Shortly after the natural mother gave birth to the child, she returned to Pennsylvania. Nevertheless, she returned to live in Kansas a couple of months later. The child's father remained in Pennsylvania. This court determined that "arguably" the mother and child had a "significant connection" with Kansas and affirmed the trial court's decision that Kansas had jurisdiction when the adoption proceedings were commenced. Moreover, this court determined that Pennsylvania did not have jurisdiction. Although the father clearly had a "significant connection" with Pennsylvania, the child did not. 19 Kan. App. 2d at 291.

Based on this court's analysis in *In re Adoption of Baby Girl B.*, it appears that a parent residing in a state and the mother's presence in that state during part of her pregnancy is not sufficient to establish a "substantial connection" between the child and the state. On the other hand, the analysis in *In re Adoption of Baby Girl B.*, suggests that a child being born in a state might be sufficient to establish a "significant connection" between the child and that state.

Here, in determining that it had jurisdiction under K.S.A. 38-1348, the trial court found that E.T. "resided with [T.M.] until birth in her womb in the state of Kansas." In addition, the trial court found that both parents were residents of Kansas when the child was born and when the petition was filed in this case. Nevertheless, neither of these findings establishes that E.T. had a "significant connection" with Kansas.

Missouri apparently was the state that had jurisdiction over the proceedings under K.S.A. 38-1348(a)(2). Although Missouri was not the "home state" of E.T., it seems that Missouri was the state that had a "significant connection" with E.T. and at least one of his parents. When the petition was filed and when the hearing occurred on T.M.'s motion to dismiss, E.T. had a significant connection with Missouri because he had been born there, had stayed in the hospital there for approximately 3 months after his birth, and was living in a foster home in Missouri. Both M.T. and T.M. also had a significant connection with Missouri because they had

previously lived there. The case involving J.T. was brought in Missouri. Furthermore, while she was pregnant with E.T., T.M. received her prenatal care in Missouri.

Moreover, substantial evidence would be available in Missouri concerning E.T.'s care, protection, training, and personal relationships. When the petition was filed in this case, T.M. was in the process of moving to Missouri. At the hearing, T.M. testified that she was living in Missouri. As discussed above, the case involving J.T. had been brought in Missouri. Presumably, the social file in that case would be relevant to E.T.'s care, protection, training, and personal relationships. Furthermore, at the time of the hearing, E.T. had spent his entire life in Missouri. His medical records and information gained from foster care concerning his care, protection, training and personal relationships would be available in Missouri.

Nevertheless, under K.S.A. 38-1348(a)(3), Kansas can exercise jurisdiction when "all courts having jurisdiction under paragraph (1) or (2) have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under K.S.A. 38-1354 or 38-1355 and amendments thereto." K.S.A. 38-1354 is the provision of the UCCJEA relating to declining jurisdiction due to an "inconvenient forum." K.S.A. 38-1355 is the provision of the UCCJEA relating to declining jurisdiction due to unjustifiable conduct.

Here, Missouri was the state that had jurisdiction under K.S.A. 38-1348(a)(2). Missouri declined to accept jurisdiction, based in part on its finding that Kansas was the more appropriate forum. The parties do not suggest that any other state (besides Missouri and Kansas) had jurisdiction under K.S.A. 38-1348(a)(1) or (2). Based on the record before us, we are unable to see how any other state besides Missouri could have jurisdiction under K.S.A. 38-1348(a)(1) or (2). Because Missouri had jurisdiction under K.S.A. 38-1348(a)(2) but declined to exercise jurisdiction on the ground that Kansas was the more appropriate forum, Kansas could assume jurisdiction under K.S.A. 38-1348(a)(3). As a result, T.M. and M.T.'s jurisdiction argument fails.

*Presumption of Unfitness as to T.M.*

Next, T.M. argues that the trial court erred in ruling that there was a presumption of unfitness when the trial court failed to determine whether the evidence supporting the presumption was a K.S.A. 60-414(a) or 60-414(b) presumption based on the rule in *In re J.L.*, 20 Kan. App. 2d 665, 891 P.2d 1125, *rev. denied* 257 Kan. 1092 (1995).

K.S.A. 38-1585 states in relevant part:

"(a) It is presumed in the manner provided in K.S.A. 60-414 and amendments thereto that a parent is unfit by reason of conduct or condition which renders the parent unable to fully care for a child, if the state establishes by clear and convincing evidence that:

(1) A parent has previously been found to be an unfit parent in proceedings under K.S.A. 38-1581 *et seq.* and amendments thereto, or comparable proceedings under the laws of another state, or the federal government;

. . . .

(3) on two or more prior occasions a child in the physical custody of the parent has been adjudicated a child in need of care as defined by subsection (a)(3) of K.S.A. 38-1502 and amendments thereto;

. . . .

"(b) The burden of proof is on the parent to rebut the presumption. . . . In the absence of proof that the parent is presently fit and able to care for the child or that the parent will be fit and able to care for the child in the foreseeable future, the court shall now terminate the parents parental rights in proceedings pursuant to K.S.A. 38-1581 *et seq.* and amendments thereto."

In setting forth the presumptions of unfitness, K.S.A. 38-1585(a) specifically refers to K.S.A. 60-414 by stating: "It is presumed in the manner provided in K.S.A. 60-414 and amendments thereto." K.S.A. 60-414 states:

"Subject to K.S.A. 60-416, and except for presumptions which are conclusive or irrefutable under the rules of law from which they arise, (a) if the facts from which the presumption is derived have any probative value as evidence of the existence of the presumed fact, the presumption continues to exist and the burden of establishing the nonexistence of the presumed fact is upon the party against whom the presumption operates; (b) if the facts from which the presumption arises have no probative value as evidence of the presumed fact, the presumption does not exist when evidence is introduced which would support a finding of the nonexistence of the presumed fact, and the fact which would otherwise be presumed shall be determined from the evidence exactly as if no presumption was or had ever been involved."

K.S.A. 60-414 sets out two different types of presumptions. A K.S.A. 60-414(a) presumption arises from facts that have probative value as evidence of the existence of the presumed fact. The burden to disprove the presumption is on the party against whom the presumption operates. A K.S.A. 60-414(b) presumption arises from facts that have no probative value as evidence of the presumed fact. Once there is evidence that would support a finding that the presumed fact does not exist, the presumption evaporates and the case proceeds as if the presumption had never existed. *In re J.L.*, 20 Kan. App. 2d at 677-78. Recognizing that a K.S.A. 60-414(a) presumption shifts the burden of proof to the opposing party and that a K.S.A. 60-414(b) presumption does not shift the burden of proof, this court in *McMurray v. Crawford*, 3 Kan. App. 2d 329, 335, 594 P.2d 1109 (1979), stated:

"Under K.S.A. 60-414, if an '(a)' presumption arises there shifts to the opposing party both the burden of coming forward with evidence and the burden of proof and if a 'b' presumption arises there shifts to the opposing party the burden of coming forward with evidence but the burden of proof does not shift."

This court in *In re J.L.* held that K.S.A. 38-1585 is applied in a constitutional manner when the trial court first determines whether the presumption of unfitness, as it applies to the case under consideration, is a K.S.A. 60-414(a) or (b) presumption. 20 Kan. App. 2d 665, Syl. ¶ 8.

Here, the trial court determined that there was a presumption of unfitness under K.S.A. 38-1585(a)(1) due to T.M. being found an unfit parent in proceedings under K.S.A. 38-1581 as to J.M. and B.M. and in comparable proceedings under Missouri law as to J.T. In addition, the trial court determined that there was a presumption of unfitness under K.S.A. 38-1585(a)(3) because on two or more occasions, a child in T.M.'s physical custody had been adjudicated a child in need of care. From what is contained in the record, the child in need of care adjudications and the termination of T.M.'s parental rights proceedings apparently were based on T.M.'s conduct of harming her child in 1996 and her resulting conviction. The trial court made no findings indicating whether the presumption applied in this case was a K.S.A. 60-414(a) or (b) presumption.

T.M. argues that the presumptions of unfitness in K.S.A. 38-1585(a)(1) and (3), as they apply to the present case, are K.S.A. 60-414(b) presumptions which evaporated once she presented evidence at the termination hearing that she was a fit mother. T.M. cites to *In re J.L.*, where this court determined that evidence of an 8-year-old termination proceeding created a K.S.A. 60-414(b) presumption which was rebutted by the mother.

In that case, the trial court terminated the mother's parental rights in her two children when the only evidence presented by the State was a certified copy of a 1986 order terminating mother's parental rights to another child. The State argued that the prior termination of parental rights created a presumption of unfitness under K.S.A. 1994 Supp. 38-1585(a)(1). The trial court agreed with the State and also took judicial notice of several other cases in which at least two other children of the mother were found children in need of care. Nevertheless, no formal evidence of these prior cases was presented during the proceedings. The trial court determined that a presumption of unfitness existed under K.S.A. 1994 Supp. 38-1585(a)(1) and (3) and that the mother had failed to rebut the presumption of unfitness. 20 Kan. App. 2d at 666-67.

On appeal, the mother argued that the presumption of unfitness under K.S.A. 1994 Supp. 38-1585(a)(1) and (3) violated her due process rights under the Fourteenth Amendment to the United States Constitution. Determining that presumptions arising from 8-year-old lawsuits should not shift the burden of proof in termination of parental rights cases, this court stated:

"The statutory presumption as employed in this case was apparently not weakened or reduced by the passage of time. There is no time limit stated in the statute, and no concession to that element appears to have been considered by the trial court. In essence, we have a result which says that because D.L.C. was adjudged unfit eight years ago, she remains unfit today. There was no effort to determine what conditions existed in 1986 and whether they still existed in 1994. We can imagine termination caused by the effects of drug and alcohol abuse which would become irrelevant if the mother and/or father or both are, eight years later, clean and sober. However, the presumption as it was employed in this case assumes that conditions have not changed in eight years. If they have changed, the burden of proving such a change is placed on the mother. We do not believe presumptions

derived from eight-year-old lawsuits should shift the burden of proof in parental termination cases.

"A comparison of the resources available to the State and to the parent places the parent at an extreme disadvantage. To allow a presumption of unfitness to be employed as it was in this case only magnifies that disadvantage. The net result is an unacceptable risk that a parent judged unfit many years ago will erroneously be adjudged unfit today for no other reason than a presumption based on the result in a case which has become irrelevant." 20 Kan. App. 2d at 672-73.

This court in *In re J.L.* held that the manner in which the trial court applied the presumption of unfitness under K.S.A. 1994 Supp. 38-1585(a)(1) and (3) violated the mother's procedural due process rights. This court set forth the rule that the trial court must first determine whether the presumption under K.S.A. 38-1585 is a K.S.A. 60-414(a) or (b) presumption. Moreover, this court stated that when there is a K.S.A. 60-414(b) presumption, *"any evidence* which would support a finding of fitness, including the uncorroborated testimony of a parent, will result in the disappearance of the presumption, and the burden of proving unfitness will once again be upon the State." 20 Kan. App. 2d at 681. This court determined, as a matter of law, that the 8-year-old termination proceeding created a K.S.A. 60-414(b) presumption which had been rebutted by the mother. 20 Kan. App. 2d at 681-82.

Similar to *In re J.L.*, the State in this case failed to present any evidence showing that the facts which resulted in the prior child in need of care adjudications and termination of T.M.'s parental rights were similar to those that existed during the time of the present case. As stated earlier, the prior child in need of care adjudications and the proceedings to terminate T.M.'s parental rights apparently were based on T.M.'s conduct in 1996. Nevertheless, the State made no effort to show that based on T.M.'s prior conduct in 1996, she would be likely to harm her child who was born nearly 8 years later. Indeed, the guardian ad litem recognized that there was an important evidentiary piece missing in this case: an expert-witness counselor who could testify concerning T.M.'s rehabilitation and the likelihood that she would harm another one of her children.

Here, there were at least five possibilities as to whether T.M. would intentionally harm E.T.: (1) a significant danger existed that

T.M. would injure E.T.; (2) a possible danger existed that T.M. would injure E.T.; (3) a slight danger existed that T.M. would injure E.T.; (4) a danger no longer existed that T.M. would injure E.T.; or (5) a combination of two or more of the above possibilities existed that T.M. would injure E.T. Now we turn our attention to the evidence in this case. There was no affirmative evidence presented that T.M. posed either a significant or a possible danger to E.T. Moreover, no evidence was introduced that T.M. had injured another child since the 1996 incident.

Determining whether a parent may be inclined to harm a child after having injured a previous child is a difficult task, especially when a significant passage of time has occurred since that injury. As a result, we determine that the State needed to bring forward some form of evidence showing that T.M.'s horrendous conduct toward J.T. in 1996 could possibly reoccur with E.T. Because such evidence was absent in this case, it is apparent that a K.S.A. 60-414(b) presumption was created.

As set forth in *In re J.L.*, when the presumption of unfitness under K.S.A. 38-1585 is a K.S.A. 60-414(b) presumption, *"any evidence* which would support a finding of fitness, including the uncorroborated testimony of a parent, will result in the disappearance of the presumption, and the burden of proving unfitness will once again be upon the State." 20 Kan. App. 2d at 681. Here, T.M. presented evidence from herself, family members, and J.T.'s daycare provider indicating that she was a fit parent who could adequately take care of E.T. Moreover, T.M. also presented testimony from a social worker who had supervised T.M.'s visits with E.T. and observed T.M. interacting appropriately with E.T. Once T.M. came forward with this evidence, the State had the burden of proving T.M.'s unfitness by clear and convincing evidence. Nevertheless, the State failed to come forward with any other evidence. The State's only evidence concerning T.M. was her conviction for the 1996 incident and the prior termination of parental rights cases which were based on the 1996 incident. This evidence alone was insufficient to support a present finding of unfitness.

In addition to finding that there was a presumption of unfitness under K.S.A. 38-1585(a)(1) and (3), the trial court also determined

that T.M. had met numerous other factors under K.S.A. 38-1583 indicating that she was unfit and that her condition was unlikely to change in the foreseeable future. Nevertheless, the only factual finding listed by the trial court under this determination is that T.M. had physically abused a child in her care by slitting her child's throat and had been convicted of a felony and imprisoned for the offense. Yet, as discussed above, this offense was committed in 1996. The State needed to bring forward some evidence showing that T.M. would still pose a danger to one of her children.

" ' "Basic parental rights are fundamental rights protected by the Fourteenth Amendment to the Constitution of the United States. The right to be the legal parent of a child is one of these rights, which cannot be abrogated except for compelling reasons." [Citations omitted.]' " *In re Adoption of B.M.W.*, 268 Kan. 871, 881, 2 P.3d 159 (2000). As this court recognized in *In re J.L.*, "[o]ther than the right to personal freedom, there may be no private right valued more highly or protected more zealously by the courts than the right of a parent to the custody and control of his or her children." 20 Kan. App. 2d at 671.

The 1996 incident of T.M. slitting her 3-year-old daughter's throat is a horrendous act and could well result in termination of T.M.'s parental rights if the State provides a sufficient evidentiary basis to show that T.M. still poses a risk to E.T. Without such evidence, however, the State has failed to meet its burden to prove by clear and convincing evidence that T.M. is an unfit parent and to terminate her parental rights.

*Child in Need of Care*

Next, T.M. argues that the State failed to prove that E.T. was a child in need of care because it relied solely on her past criminal conviction and termination of her parental rights. An appellate court reviews the trial court's finding for adjudication as a child in need of care under the substantial competent evidence standard. *In re S.M.H.*, 33 Kan. App. 2d 424, 431, 103 P.3d 976, *rev. denied* 279 Kan. 1006 (2005).

A "child in need of care" is defined as an individual less than 18 years old who, among other things, is "without adequate parental

care, control or subsistence and the condition is not due solely to the lack of financial means of the child's parents or other custodian" or "without the care or control necessary for the child's physical, mental or emotional health" or "has been physically, mentally or emotionally abused or neglected or sexually abused." K.S.A. 2005 Supp. 38-1502(a)(1), (2), and (3).

In arguing that there was sufficient evidence to adjudicate E.T. a child in need of care, the State cites *In re R.B.S.*, 29 Kan. App. 2d 1023, 36 P.3d 300 (2001). In that case, R.B.S., a newborn, was taken into Social and Rehabilitation Services' protective custody and the State filed a child in need of care petition after R.B.S.'s parents attempted to remove him from the hospital early, his father, P.S., threatened a hospital security guard, and his mother, L.S., told the security officer that R.B.S.'s father abused her. Testimony at the child in need of care hearing revealed that L.S. told other hospital personnel that P.S. abused her. Moreover, approximately a year before R.B.S.'s birth, L.S. told a law enforcement officer that P.S. had left her and their older child in the cold without money or food. The older child's babysitter testified that L.S. would bring her the older baby wet and dirty and without appropriate clothing. When the child in need of care hearing was held, R.B.S. had never lived with his parents. 29 Kan. App. 2d at 1024-25.

On appeal, the parents argued that there was insufficient evidence to find R.B.S. a child in need of care. This court disagreed, stating that evidence of the parents' violent relationship and their neglect of the older son was sufficient to adjudicate R.B.S. a child in need of care. This court referred to K.S.A. 38-1583a(b)(2) "which allows consideration of 'conduct toward *a* child of a physically, emotionally or sexually cruel or abusive nature.' " 29 Kan. App. 2d at 1028. Although K.S.A. 38-1583a set forth the factors to be considered in a termination proceeding, this court noted that the statute provided guidance in the child in need of care hearing. Determining that a child may be adjudicated in need of care even though the child has never been in the custody of the parents, this court stated:

"[A] child may be adjudicated in need of care because he or she is without proper parental care necessary for the child's physical, mental, or emotional health, even if the parent has never been given a chance to prove himself or herself as to that particular child. Once there is evidence of a parent's unfitness—even if it relates to a child other than the one at issue—we need not gamble with the health or life of the child before us. [Citation omitted.]" 29 Kan. App. 2d at 1029.

Here, similar to *R.B.S.*, the State presented evidence concerning the parent's cruel or abusive treatment toward an older sibling. In addition, the State in this case presented evidence that T.M. had her parental rights terminated in her three children. This evidence provided a sufficient evidentiary basis for the trial court to adjudicate E.T. a child in need of care. Once this evidence was presented, the trial court need not gamble with the health or life of E.T. by placing him back with T.M.

We determine that T.M.'s abusive conduct towards her older child in 1996, along with the prior terminations of her parental rights in three children, provided substantial competent evidence to support the adjudication of E.T. as a child in need of care.

*Termination of Parental Rights as to M.T.*

Finally, M.T. contends that the trial court erred in finding that he was presumptively unfit and terminating his parental rights in E.T. "The standard of review in a termination of parental rights is whether substantial competent evidence supports the trial court's findings." *In re J.J.G.*, 32 Kan. App. 2d 448, 454, 83 P.3d 1264 (2004). Moreover, M.T.'s argument on this issue requires interpretation of K.S.A. 38-1585. Interpretation of a statute presents a question of law over which this court has unlimited review. *In re M.E.B.*, 29 Kan. App. 2d 687, 688, 29 P.3d 471 (2001).

In terminating M.T.'s parental rights, the trial court found that M.T. "is presumed to be an unfit parent under K.S.A. 38-1585[a](3) due to the fact that *on one or more occasions* a child in the physical custody of the parent has been adjudicated a child in need of care." (Emphasis added.) Nevertheless, a presumption of unfitness under K.S.A. 38-1585(a)(3) requires that a child in need of care adjudication must have occurred on *two or more* prior occasions. Specifically, K.S.A. 38-1585(a)(3) states that there is a pre-

sumption of unfitness if the State establishes by clear and convincing evidence that "on two or more prior occasions a child in the physical custody of the parent has been adjudicated a child in need of care as defined by subsection (a)(3) of K.S.A. 38-1502 and amendments thereto." The trial court's finding runs counter to the language of K.S.A. 38-1585(a)(3).

When making this finding, the trial court was relying on evidence presented at the termination hearing concerning the case in Missouri involving J.T. At the termination hearing, the State introduced into evidence a "Judgment and Order of Disposition" and a "Stipulation and Agreement (For Disposition)" filed in the Circuit Court of Monroe County, Missouri. These documents indicated that J.T. had been removed from M.T.'s custody twice because M.T. was living with T.M. After J.T. was removed from M.T.'s physical custody the second time, M.T. stipulated that J.T. was in need of the care and treatment of the Missouri court under the pertinent Missouri statute.

M.T. argues that the trial court erred in relying on proceedings from the State of Missouri to establish a presumption under K.S.A. 38-1585(a)(3). M.T. maintains that under K.S.A. 38-1585(a)(3), a presumption of unfitness occurs only when a child in need of care adjudication occurs in Kansas under K.S.A. 38-1502(a)(3).

In his brief, M.T. compares K.S.A. 38-1585(a)(3) with other subsections of that statute which contain language that would include laws of another state. For example, subsection (a)(1) of K.S.A. 38-1585 provides for a presumption of unfitness when "[a] parent has previously been found to be an unfit parent in proceedings under K.S.A. 38-1581 *et seq.* and amendments thereto, *or comparable proceedings under the laws of another state, or the federal government.*" (Emphasis added.) Moreover, subsection (a)(2) of K.S.A. 38-1585 provides for a presumption of unfitness when "a parent has twice before been convicted of a crime specified in article 34, 35, or 36 of chapter 21 of the Kansas Statutes Annotated, or comparable offenses *under the laws of another state, the federal government or any foreign government.*" (Emphasis added.)

Unlike those other subsections of K.S.A. 38-1585, K.S.A. 38-1585(a)(3) has no language indicating that a presumption of unfit-

ness still applies when the prior proceedings have occurred in other jurisdictions. Rather, K.S.A. 38-1585(a)(3) states that there is a presumption of unfitness if the State establishes by clear and convincing evidence that on at least two prior occasions a child in the parent's physical custody "has been adjudicated a child in need of care as defined by subsection (a)(3) of K.S.A. 38-1502."

Nevertheless, the plain language of K.S.A. 38-1585(a)(3) does not limit itself to proceedings that occur only in Kansas. Instead, K.S.A. 38-1585(a)(3) applies when there has been an adjudication of a child in need of care *as defined by K.S.A. 38-1502(a)(3)*. K.S.A. 2005 Supp. 38-1502(a)(3) defines a "child in need of care" as an individual under 18 years of age who "has been physically, mentally or emotionally abused or neglected or sexually abused." This definition can lend itself to child in need of care proceedings in other jurisdictions.

Here, there was no indication in the judgment and stipulation filed in the Missouri court, nor any other evidence presented at the termination hearing, to establish that J.T. was a child in need of care because he had been "physically, mentally or emotionally abused or neglected or sexually abused." See K.S.A. 2005 Supp. 38-1502(a)(3). Therefore, the presumption under K.S.A. 38-1585(a)(3) does not apply in this case.

The trial court also determined that M.T. had met several factors under K.S.A. 38-1583 indicating that he was an unfit parent and that his condition was unlikely to change in the foreseeable future. Nevertheless, the only factual finding listed under this determination was that M.T. had been convicted of attempted burglary, a felony, and had served time in prison. The trial court failed to indicate how M.T.'s prior conviction would affect his ability to parent. On the record that is before this court, there is no indication how M.T.'s prior conviction and imprisonment rendered him an unfit parent. There was not substantial competent evidence to support the trial court's decision terminating M.T.'s parental rights in E.T.

Affirmed in part, reversed in part, and remanded.

JOHNSON, J., concurring: I concur in the result. I particularly agree with the majority's holding that mother's conviction for ag-

gravated battery upon an older child was sufficient to support E.T.'s child in need of care adjudication.

However, I would restrict our holding on jurisdiction to simply finding that Kansas obtained child-custody jurisdiction pursuant to K.S.A. 38-1348(a)(3) when Missouri declined to exercise jurisdiction. I perceive it unnecessary and ill-advised to declare Missouri the home state of E.T., in contravention of that forum's finding that Kansas was E.T.'s home state. Further, I am uncomfortable declaring that E.T. had no significant connection with Kansas. Nevertheless, as the majority notes, when Missouri dismissed its action in favor of Kansas, this State remained as the only viable forum in which to litigate child custody.

Likewise, I would find that reversal of M.T.'s termination of parental rights is required by the district court's reliance on an inapplicable presumption. As the majority notes, the trial court misapplied K.S.A. 38-1585(a)(3) to M.T., based on only one prior child in need of care adjudication. To me, that finding would so taint the district court's ruling as to require remand for a determination based solely upon the factors described in K.S.A. 2005 Supp. 38-1583.

Finally, I feel compelled to comment on the precedent set by *In re J.L.*, 20 Kan. App. 2d 665, 891 P.2d 1125, *rev. denied* 257 Kan. 1092 (1995). That case involved a proceeding in 1994 to terminate the mother's parental rights in which the State relied solely on a certified copy of a 1986 order terminating mother's parental rights to another child. Apparently, the facts supporting the 1986 termination were not presented in the 1994 case, although the same judge presided over both proceedings. Mother argued that the presumption of unfitness in K.S.A. 1994 Supp. 38-1585(a)(1) and (3) violated her due process rights under the Fourteenth Amendment to the United States Constitution.

After discussing procedural due process in general and the specific liberty interests of a parent, a majority of the court found that "the presumption as applied in this case was a violation of the procedural due process rights of the natural mother." 20 Kan. App. 2d at 676. In reaching that result, the majority appeared to be troubled that an 8-year-old adjudication could shift the burden of

proof to the mother without the State showing that the facts supporting the prior unfitness remained relevant to the question of the mother's current fitness to parent. 20 Kan. App. 2d at 672-73.

However, the *In re J.L.* majority recognized its duty to construe a statute in a manner that would be constitutional, if its construction would retain the apparent legislative intent of the enactment. 20 Kan. App. 2d at 677. Therefore, the majority did not hold that K.S.A. 38-1585 was unconstitutional on its face, but rather upheld its general provisions by focusing on the phrase, "in the manner provided in K.S.A. 60-414." 20 Kan. App. 2d at 677-78.

As noted in our majority opinion above, *In re J.L.* directed the trial court to make the initial determination of whether the State had presented a K.S.A. 60-414 subsection (a) presumption or a subsection (b) presumption. The majority recites the trial court's task as determining whether the presumption arises from facts that have probative value as evidence of the existence of the presumed fact. *In re J.L.* suggested that trial courts, in making that determination, consider the following factors:

"(1) the passage of time between the earlier order of termination and the current proceeding; (2) whether the same children or siblings of those children were involved in the earlier proceeding; (3) whether the father or fathers of the children involved are the same persons involved in the prior proceeding; (4) whether the facts on which the earlier presumption is based bear any resemblance to the current factual scenario; (5) whether the circumstances surrounding the presumption are such that, in accordance with the experience of mankind, there is a natural and rational evidentiary relation between the facts proven in the earlier action and the facts alleged to be true in the current action; (6) whether the parent has more convenient access to evidence relating to the unfitness to be presented; and (7) whether, by requiring the parent to go forward with the evidence to rebut the presumption, he or she is thereby being subjected to unfairness or hardship." 20 Kan. App. 2d at 681-82.

The *In re J.L.* majority invited trial courts to consider other relevant factors, noting that its list was not intended to be exclusive. However, trial courts were directed to "give a detailed analysis of all the factors explaining the reasons for [their] decision[s]" and warned that "[a] conclusory determination that unfit once means unfit always will not be accepted." 20 Kan. App. 2d at 682.

Interestingly, in analyzing the impact of K.S.A. 60-414 on burden shifting, *In re J.L.* did not discuss the explicit legislative mandate in subsection (b) of K.S.A. 38-1585 that clearly states: "The burden of proof is on the parent to rebut the presumption." K.S.A. 38-1585(b) does not recognize the distinction between a K.S.A. 60-414(a) presumption and a subsection (b) presumption, nor does it acknowledge that sometimes the presumption only creates a burden to come forward with evidence without shifting the burden of proof. By necessity, then, the *In re J.L.* court implicitly nullified, or at least seriously modified, that portion of the statute.

My concern is that the legislature has amended K.S.A. 38-1585 twice since the 1995 decision in *In re J.L.*, including modifying the provisions of subsection (b). See L. 1998, ch. 139, sec. 9; L. 2000, ch. 174, sec. 15. However, the provision that unequivocally places the burden of proof on the parent to rebut the presumption of unfitness remains as it was prior to *In re J.L.* In fairness to the legislature, as well as to the bench and bar of this State, we should clarify that *In re J.L.'s* statutory construction resulted in K.S.A. 38-1585(b) not meaning what it clearly and plainly says.

Personally, I favor the analysis in Judge Pierron's concurring opinion in *In re J.L.*, in which he opined that, after the majority reworked the statute to make it constitutional, "there is no presuming left in the presumption." 20 Kan. App. 2d at 682. If the State must prove the current relevance of the facts which supported the prior termination, it is well on the way to meeting its burden without the presumption. Further, I perceive that we are asking trial courts to engage in a complicated analysis to reach a largely subjective determination. As a practical matter, the procedure destroys the efficacy of the K.S.A. 38-1585 presumptions. "To avoid confusion, we should simply say this attempt to create a presumption out of evidence that may have little weight or relevance is violative of our due process protections." 20 Kan. App. 2d at 683 (J., Pierron, concurring).

At the very least, however, I would find that the trial court failed to give a detailed analysis of all of the factors to explain its decision to apply K.S.A. 38-1585(a)(1) as a K.S.A. 60-414(a), burden-shifting presumption. Giving deference to our 8-year-old precedent of

*In re J.L.*, we cannot accept the trial court's conclusory determination, and reversal is required.