No. 126,807

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of S.C.,
a Minor Child.

SYLLABUS BY THE COURT

1.

The revised Kansas Code for Care of Children, K.S.A. 38-2201 et seq., generally confers original jurisdiction to Kansas courts to hold proceedings concerning any child who may be a child in need of care (CINC). The Legislature, however, has purposely placed limits on this jurisdiction by making it subject to the Uniform Child-Custody Jurisdiction and Enforcement Act, known as the UCCJEA. Accordingly, the UCCJEA applies to Kansas CINC cases.

2.

The primary purpose of the UCCJEA is to avoid jurisdictional competition and conflict with courts of other states. The UCCJEA achieves this goal of preventing jurisdictional disputes with rules that generally limit jurisdiction related to a child's custody and care to one state at a time.

3.

The UCCJEA prioritizes the four bases or grounds under which a district court can acquire jurisdiction: (1) home state, (2) significant connections, (3) more appropriate forum, and (4) default or vacuum jurisdiction.

4.

Provided that no other provisions conflict, the highest and first priority is given to the child's home state on the date the proceeding commences. The UCCJEA defines

1

"home state" as the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding.

5.

Once a court in the child's home state exercises jurisdiction, the home state has exclusive, continuing jurisdiction unless special circumstances exist or changes occur that allow the custody determination to be modified by another state. If the child does not have a home state, the district court should consider the remaining three bases by which a court attains initial child custody jurisdiction.

6.

A UCCJEA analysis is required if there is a possible jurisdictional issue in a CINC case.

Appeal from Finney District Court; CHRISTOPHER SANDERS, judge. Submitted without oral argument. Opinion filed December 6, 2024. Affirmed.

*Coleman J. Younger*, of Younger Law Office, of Garden City, for appellant natural father.

*Isaac LeBlanc*, assistant county attorney, and *Susan Lynn Hillier Richmeier*, county attorney, for appellee.

*Blair W. Loving*, guardian ad litem, of Hope, Mills, Bolin, Collins & Ramsey LLP, of Garden City.

Before ATCHESON, P.J., HURST and PICKERING, JJ.

PICKERING, J.:  We are asked to determine whether the district court had jurisdiction under the Uniform Child-Custody Jurisdiction and Enforcement Act

(UCCJEA), K.S.A. 23-37,101 et seq., in a child in need of care (CINC) case. On appeal, K.C. (Father) challenges the district court's termination of his right to parent S.C. He contends the district court lacked subject matter jurisdiction under the UCCJEA. He also argues that his due process rights were violated due to an 11-month gap between the motion to terminate his rights and the hearing on that motion, and that the State produced insufficient evidence that he was an unfit parent. Upon review, we find the district court had initial child custody jurisdiction and could therefore enter an initial child custody order, Father's due process rights were not violated, and the State produced sufficient evidence that Father was unfit. We affirm the termination of Father's parental rights.

A CINC CASE BEGINS IN KANSAS

S.C. (born in 2014) moved from Columbia, Missouri, to Garden City, Kansas, with Father, Mother, and her brothers on September 30, 2019. On December 6, 2019, S.C. disclosed to the school counselor that her brother "had tried to marry her and hurt her in the butt." On December 9, 2019, the Assistant Finney County Attorney filed a petition alleging that S.C. was a CINC. The petition stated that the court had "jurisdiction to make a child custody determination pursuant to K.S.A. 23-37,204(a)," which is the emergency jurisdiction section of the UCCJEA. Under the "Facts Alleged" section of the CINC petition, it stated that the police officer responding to the school where S.C. disclosed the sexual abuse to a school counselor was aware that "[Brother] had previously victimized [S.C.] when they lived in Columbia, Missouri." It added that S.C. told the school counselor that the family had been living in their new house for approximately one to two weeks.

The petition and subsequent hearings involved both Father and Mother, but Mother is not a party to this appeal.

3

The petition further alleged that S.C. provided the following information during a forensic interview by the Child Advocacy Center:

"[S.C.] identified the parts of the body where [Brother] would hump her as her vagina and buttocks, which she referred to as pee-pee and butt. She stated [Brother] had pulled down her pants and humped her in a room with a white couch after he pulled down her pants. She described hers and [Brother's] clothing as being on and off. When asked what part of his body [Brother] humped her with she pointed to the penis on an anatomical drawing, which she referred to as pee-pee. She also stated [Brother's] pee-pee went inside her pee-pee. She told him no and he didn't listen. She advised he eventually let her go and she went to [Father] and told him what happened. [S.C.] advised [Father] then 'hurt' [Brother] for what happened. She stated [Father] told her not to tell anyone what happened. When asked how old she was when this occurred, she said it happened on Friday."

Following the forensic interview, S.C. was put into police protective custody and taken to an emergency placement. On December 11, 2019, the district court ordered S.C. to be placed in the custody of the Department for Children and Families (DCF) in out-of-home placement. The district court entered an order of temporary custody with DCF after finding that an emergency existed in which it was in the child's best interests not to return home. The Order of Temporary Custody stated: "The Court finds that jurisdiction and venue are proper." The district court did not specifically address the UCCJEA in its orders.

The district court continued the adjudication hearing several times for reasons not apparent by the record. On January 25, 2021, more than a year after S.C. was placed in DCF custody, the district court adjudicated S.C. as a CINC and ordered S.C. to remain in DCF custody. The adjudication hearing transcript is not in the record on appeal. The journal entry memorializing the hearing was issued on April 6, 2021, with no indication of why it took over two months to file. The court's order stated that it found jurisdiction

was proper, but there is nothing in the record on appeal to suggest that the court specifically considered whether Kansas had proper jurisdiction under the UCCJEA.

The district court held a permanency hearing the same date—January 25, 2021. At that time, the court found that reintegration remained a viable goal but that it was still in S.C.'s best interests to remain in DCF custody. Again, the journal entry was not issued until April 6, 2021, for reasons unknown.

Another permanency hearing was held March 28, 2022. A written decision was filed April 18, 2022. The district court found that Father's progress towards reintegration was not adequate despite S.C. being in DCF custody for over 800 days. The district court changed the permanency plan to adoption, finding reintegration was no longer a viable goal. The district court set the matter for a pretrial hearing on June 27, 2022, and for hearing on the "upcoming" motion to terminate parental rights on July 27, 2022.

The State moved to terminate Mother's and Father's parental rights on July 19, 2022. The State alleged that Father "failed to carry out a substantial portion of the Reintegration Plan" and put forth "insufficient effort" "to provide for the basic needs of [S.C.]." The State asserted that Father "demonstrated inappropriate physical contact with the child throughout the case." The State claimed that

> "[S.C.] disclosed that when she would watch scary movies, she would sleep with her dad and cuddle. She would then wake up without clothes on. The child did not know how her clothes came off and her father slept with her in the bed. [S.C.] commented her dad could touch her private areas because he's her dad."

The State further alleged that visitation between Father and S.C. remained supervised "because [Father] has not demonstrated age appropriate boundaries in regards to physical contact with the child." The State relied on information from Father's

5

psychological evaluation that concluded reintegration was "not likely to be successful because there is knowledge of children acting out sexually with one another in the home and father . . . has coached [S.C.] to keep it a secret which leads the evaluator to wonder if father believes this type of behavior is normal." Finally, the State alleged that "Father continues to take no accountability in the abuse that occurred in his household. Saint Francis continues to be concerned about the abuse that occurred in [Father's] care and his ability to protect his children from future abuse."

Also filed on July 19, 2022, was a motion to reassign the matter to a district court judge instead of a district magistrate judge. The motion itself is not in the record on appeal. On August 30, 2022, the Chief Judge assigned the case to a district court judge for all further proceedings. The matter came before the court for a status review on October 11, 2022. The district court set the termination hearing for January 25, 2023, but the matter was continued to June 14, 2023, with no apparent objections.

The district court held an evidentiary hearing on termination of Mother's and Father's parental rights on June 14 and June 15, 2023. Mother did not appear. The district court accepted the State's proffer of her unfitness and found factual bases existed to determine her unfitness. The district court found Mother to be unfit and terminated her parental rights.

The State called the following witnesses concerning Father: Melissa Fulton (the forensic interviewer at the Child Advocacy Center), Katrina Jones (S.C.'s individual therapist), Sasha Mai (a family support worker with St. Francis Ministries [SFM]), Angelique Quint (a case manager for the reintegration department at SFM), and Deanna Barnett (a mental health counselor who performed a psychological evaluation with parenting emphasis on Father). Barnett submitted a report based on her review of the Missouri's Department of Social Services (DSS) reports, which indicated that after Father

6

moved from Kansas to Missouri in 2015, DSS issued reports on the family from 2016 through 2019.

Father's attorney did not argue at the termination hearing that Missouri was the home state or that the district court lacked subject matter jurisdiction, but he alluded to a jurisdictional problem through his cross-examination of witnesses. When Father's counsel cross-examined Fulton, counsel asked, "Were you aware if that—if the family had recently moved from a different state?" He followed up with, "Through your . . . meetings with [S.C.], the humping and the kissing on the mouth, and was that—do you know if that was in Kansas or a different state?" When Father's counsel cross-examined Barnett, counsel asked, "[F]rom your research, you were aware of there was another case in Missouri; is that correct, for this family?" Then he asked, "[T]his alleged abuse, did that happen in Missouri or in Kansas?"

Details of the remaining testimony at the termination hearing will be addressed in the analysis of the district court's findings below.

From the bench, the district court ruled that there was clear and convincing evidence for finding that Father was unfit, his conduct or condition was unlikely to change in the foreseeable future, and it was in S.C.'s best interests for Father's parental rights to be terminated. At the time of the hearing, S.C. had been in DCF custody for 42 months.

ANALYSIS

I.      THE DISTRICT COURT HAD INITIAL CHILD CUSTODY JURISDICTION

*Subject matter jurisdiction under the UCCJEA*

Father appeals the district court's order terminating his parental rights to S.C. on the ground that the district court lacked subject matter jurisdiction under the UCCJEA. Recently, in *Nicholson v. Mercer*, 319 Kan. ___, 2024 WL 4897814, at *2, 3 (2024), the Kansas Supreme Court "clarified the true nature of subject-matter jurisdiction in Kansas" by explaining that "subject-matter jurisdiction is simply the constitutional power of courts in this state to decide disputes." Stated differently, "[s]ubject matter jurisdiction concerns the court's authority to hear and decide cases." *In re K.L.B.*, 56 Kan. App. 2d 429, 437, 431 P.3d 883 (2018). If the district court lacks jurisdiction to make a ruling, its judgment is void. *In re Adoption of A.A.T.*, 287 Kan. 590, Syl. ¶ 2, 196 P.3d 1180 (2008).

We are first tasked with whether this issue may be raised for the first time on appeal. Father did not raise this issue in the district court or explain why we may consider this issue for the first time on appeal. See *In re A.S.*, 319 Kan. 396, 399, 555 P.3d 732 (2024); Supreme Court Rule 6.02(a)(5) (2024 Kan. S. Ct. R. at 36). Without either of these actions, Father has not preserved this issue for review. Subject matter jurisdiction, however, "cannot be waived and may be raised at any time, whether it be for the first time on appeal or even upon the appellate court's own motion." *Vorhees v. Baltazar*, 283 Kan. 389, 397, 153 P.3d 1227 (2007). Even if the parties do not question our subject matter jurisdiction, we also have "an independent duty" to do so. *In re A.A.*, 51 Kan. App. 2d 794, 805, 354 P.3d 1205 (2015). We have recognized that a UCCJEA jurisdiction question raises a subject matter jurisdiction question. 51 Kan. App. 2d 794, Syl. ¶ 1 ("The Uniform Child Custody Jurisdiction and Enforcement Act [UCCJEA] is one such

limitation on the subject-matter jurisdiction of the Kansas district courts."). Thus, we will consider this issue.

*Standard of Review*

"Subject-matter jurisdiction raises a question of law subject to unlimited review." *In re A.A.-F*., 310 Kan. 125, Syl. ¶ 1, 444 P.3d 938 (2019). "Because subject matter jurisdiction is ordinarily conferred by statute, it should be noted that the interpretation of a statute is also a question of law subject to unlimited review." *Kingsley v. Kansas Dept. of Revenue*, 288 Kan. 390, 395, 204 P.3d 562 (2009).

*The UCCJEA applies to Kansas CINC cases.*

The revised Kansas Code for Care of Children (Code), K.S.A. 38-2201 et seq., "generally confers original jurisdiction on Kansas courts to hold proceedings concerning any child who may be a child in need of care." *In re A.A.-F.*, 310 Kan. 125, Syl. ¶ 3. As the Kansas Supreme Court noted in *In re A.A.-F.*, the Legislature has purposely placed limits on this jurisdiction, making it subject to the UCCJEA. 310 Kan. 125, Syl. ¶ 3. Accordingly, the UCCJEA applies to Kansas CINC cases. K.S.A. 38-2203.

The primary purpose of the UCCJEA is to avoid jurisdictional competition and conflict with courts of other states. *In re A.A.-F*., 310 Kan. 125, Syl. ¶ 4. The UCCJEA achieves this goal of preventing jurisdictional disputes with rules that generally limit jurisdiction related to a child's custody and care to "*one state at a time*." (Emphasis added.) *In re A.W.*, 60 Kan. App. 2d 296, 302, 493 P.3d 298 (2021). Outside of Massachusetts, which adopted an earlier, similar uniform act, every state, including Kansas and Missouri, has adopted the current UCCJEA. *In re A.A.*, 51 Kan. App. 2d 794, 804, 354 P.3d 1205 (2015).

*There are four ways by which a district court attains initial child custody jurisdiction.*

With this primary purpose in mind, the UCCJEA prioritizes the four bases or grounds under which a district court can acquire jurisdiction: (1) home state, (2) significant connection, (3) more appropriate forum, and (4) default or vacuum jurisdiction. K.S.A. 23-37,201(a).

The highest and first priority is given to the child's home state on the date the proceeding commences. K.S.A. 23-37,201(a)(1); *In re A.A.-F.*, 310 Kan. 125, Syl. ¶ 4. The UCCJEA defines "'[h]ome state'" as "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding." K.S.A. 23-37,102(8). Once a court in the child's home state exercises jurisdiction, the home state has "exclusive, continuing jurisdiction" unless special circumstances exist or changes occur that allow the custody determination to be modified by another state. *In re A.A.-F.*, 310 Kan. 125, Syl. ¶ 5; *In re Z.E.H.*, No. 109,799, 2013 WL 5975324, at *8 (Kan. App. 2013) (unpublished opinion).

If the child does not have a home state, the district court should consider the remaining three bases by which a court attains initial child custody jurisdiction. This begins with the second basis, significant connection jurisdiction, which is "conjunctive in critical ways." *In re S.L.*, 61 Kan. App. 2d 276, 307, 503 P.3d 244 (2021). That is, "[i]f no court has home state jurisdiction," a Kansas court has jurisdiction when "(A) the child *and* the parents, or the child *and* at least one parent or person acting as a parent have a significant connection with the state other than mere physical presence, *and* (B) substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships." 61 Kan. App. 2d at 307-08; see K.S.A. 23-37,201(a)(2).

10

The third basis is the "'more appropriate forum'" jurisdiction. 61 Kan. App. 2d at 308. This occurs if all courts having home state or significant connection jurisdiction decline to exercise their jurisdiction on the ground that another state is the "more appropriate forum." K.S.A. 23-37,201(a)(3). The UCCJEA lists several factors that the court should consider when making this determination. K.S.A. 23-37,207(b).

The fourth basis is the default or vacuum jurisdiction. 61 Kan. App. 2d at 308. A state has initial child custody jurisdiction when "no court of any other state would have jurisdiction under the criteria specified" for home state jurisdiction, significant connection jurisdiction, or a more appropriate forum jurisdiction. K.S.A. 23-37,201(a)(4).

*A UCCJEA analysis is required if there is a possible jurisdictional issue.*

In view of the four UCCJEA bases by which a state attains jurisdiction in a CINC case with interstate connections, a district court "errs by assuming subject-matter jurisdiction . . . without making sure that the provisions of the UCCJEA have been satisfied." *In re A.A.*, 51 Kan. App. 2d at 806. Here, the district court would have been on notice that this was a case with interstate connections. The State's CINC petition stated that S.C. had previously resided in Missouri. The State asserted that the district court had jurisdiction "to make a child custody determination" under K.S.A. 23-37,204(a). Under this statutory subsection, a court has "temporary emergency jurisdiction if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child . . . is subjected to or threatened with mistreatment or abuse." K.S.A. 23-37,204(a). The State's petition also stated that the police officer responding to the school where S.C. disclosed the sexual abuse to a school counselor was aware that her brother had previously victimized S.C. "when they lived in Columbia, Missouri."

11

But here, the district court appears to have assumed initial child custody jurisdiction over a case that had interstate connections without undertaking a UCCJEA analysis. The record does not indicate that the district court considered whether the UCCJEA applied and, if so, whether the Kansas court had initial child custody jurisdiction. Despite this, as discussed below, the district court was not deprived of jurisdiction.

*In a UCCJEA analysis, the first step is determining whether there is a home state.*

With the highest and first priority given to the child's home state, a district court should first consider if the child has a home state. See K.S.A. 23-37,201(a)(1); K.S.A. 23-37,102(8). Father alleges that S.C. was a resident of Missouri when the State filed a CINC petition on December 9, 2019. The record reflects that S.C. lived in Missouri from 2015 through September 30, 2019, and began living in Kansas with her parents on October 1, 2019. While the Missouri DSS, a state administrative agency, did intervene with the family and established a plan to assist the family, no court case was ever filed in Missouri. As such, no Missouri court entered a custody order, which would have triggered the UCCJEA. See Mo. Ann. Stat. § 452.740.1(1) (a Missouri court has jurisdiction to make an initial child custody determination only if "[t]his state is the home state of the child on the date of the commencement of the proceeding").

Under different circumstances, Missouri may have continued as the home state had one of the parents continued to reside there. See Mo. Ann. Stat. § 452.740.1(1). The undisputed evidence establishes that S.C. and both her parents moved from Missouri and had begun residing in Kansas less than six months before this action was filed. Neither Kansas nor Missouri qualified as a home state.

*We next consider whether the district court had significant connection jurisdiction under K.S.A. 23-37,201(a)(2).*

Having concluded that S.C. did not have a home state, we next consider whether Kansas or Missouri had significant connection jurisdiction. See K.S.A. 23-37,201(a)(2). On appeal, both the State and the guardian ad litem (GAL) argue that S.C. has a significant connection with Kansas. As a reminder, the bases for finding significant connection jurisdiction are: "(A) the child *and* the parents, or the child *and* at least one parent or person acting as a parent have a significant connection with the state other than mere physical presence, *and* (B) substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships." *In re S.L.*, 61 Kan. App. 2d at 307-08.

Kansas has not defined the term "significant connection" as applied to the UCCJEA. But as the UCCJEA is a uniform act adopted by 49 states, we may look to other states' interpretations of the Act. See *In re E.T.*, No. 111,971, 2015 WL 1125364, at *7 (Kan. App. 2015) (unpublished opinion) (comparing UCCJEA cases from California, Iowa, and Vermont); *Arizona Dept. of Economic Sec. v. Grant ex rel. County of Maricopa*, 232 Ariz. 576, 580, 307 P.3d 1003 (Ct. App. 2013) (considering other jurisdictions which had defined the term "significant connection").

*We consider several cases to be significant.*

In *Rennie v. Rosenthol,* 995 A.2d 1217 (Pa. Super. Ct. 2010), a Pennsylvania court looked at the dictionary meaning of the words and determined "'significant connection'" meant the connection to the state must be meaningful. 995 A.2d at 1221; see also Webster's New World College Dictionary 1351 (5th ed. 2014) (defining "significant" as "1. Having or expressing a meaning 2. important"). A significant connection is therefore not trivial or slight.

13

Accordingly, to determine whether a child has a significant connection to justify the exercise of "exclusive, continuing jurisdiction," a court "must look at the nature and quality of the child's contacts with the parent[s] living in the [state]." 995 A.2d at 1221-22. Under this framework, "a majority of jurisdictions have found a significant connection . . . where one parent resides in the state and exercises at least some parenting time in the state." *White v. Harrison-White*, 280 Mich. App. 383, 392, 760 N.W.2d 691 (2008). Determining whether there is a "significant connection" to a state does require a factual analysis of the record. *Arizona Dept. of Economic Sec.*, 232 Ariz. at 580.

In *In the Matter of the Marriage of Schwartz and Battini*, 289 Or. App. 332, 344, 410 P.3d 319 (2017), the Court of Appeals of Oregon first determined that Oregon was not the child's home state. The *Schwartz* court proceeded under Or. Rev. Stat. § 109.741(1)(b), Oregon's statute codifying the UCCJEA § 201(a)(2), which is identical to K.S.A. 23-37,201(a)(2). The court looked to the record for evidence of a significant connection to Oregon and found evidence that the mother was from Oregon, the child was born in Oregon, and the child's doctor was in Oregon. Additionally, the child's maternal grandparents—who lived half the year in Oregon—spent considerable time with the child in Oregon. From this record, the appellate court found that the child had a significant connection with Oregon, and thus Oregon had significant connection jurisdiction. 289 Or. App. at 344.

In Kansas, panels of this court have held that courts have jurisdiction due to a child's significant connection to Kansas. See *In re Marriage of Ruth*, 32 Kan. App. 2d 416, 421-22, 83 P.3d 1248 (2004) (affirming lower court's decision that Kansas has "exclusive, continuing jurisdiction" over child custody issues because the children had a significant connection to Kansas due to regular visits with their father); see also *In re Adoption of Baby Girl B.*, 19 Kan. App. 2d 283, 291, 867 P.2d 1074 (1994).

In contrast, other panels of this court have found that a child had no significant connection to Kansas. See *In re S.L.*, 61 Kan. App. 2d at 308 (finding no significant connection with Kansas where child "had not lived in Kansas for two years, had not been enrolled in school [in Kansas], and had no more extended family [in Kansas] than she had in the Netherlands"); *In re E.T.*, 36 Kan. App. 2d 56, 67-68, 137 P.3d 1035 (2006) (finding child had significant connection with Missouri because he was born in Missouri, was in foster care in Missouri, and child's "medical records and information gained from foster care concerning his care, protection, training and personal relationships" were in Missouri); *In re Marriage of Harris*, 20 Kan. App. 2d 50, 60, 883 P.2d 785 (1994) (finding children had no significant connection to Kansas when father filed for divorce in Kansas one day after removing children from Georgia).

> *We look for evidence in the record of S.C.'s significant connection with Kansas.*

Under this subsection, we first consider whether "[t]he child and the child's parents, or the child and at least one parent or person acting as a parent, have a significant connection with this state other than mere physical presence." K.S.A. 23-37,201(a)(2)(A). In this case, both of S.C.'s parents reside in Kansas and both exercise parenting time in Kansas. The record reflects that S.C. was born in Kansas in 2014 and later moved to Missouri. On October 1, 2019, she and her family returned to live in Kansas. Neither parent returned to Missouri but chose to remain in Kansas. Once settled in Garden City, Mother was able to find work at Goodwill, while Father stayed home to care for the children. Consequently, at the time the petition was filed, S.C. was living with both parents, her older brother, and her paternal grandmother with no apparent or expressed intent to leave Kansas.

Another factor showing a meaningful presence in Kansas was S.C.'s enrollment in a Kansas grade school. The parents' decision to enroll S.C. into school in Garden City

shortly after arriving provides strong circumstantial evidence of an intent to remain for an extended period—going well beyond a mere transient presence of limited, though indefinite, duration. See *DeLima v. Tsevi*, 301 Neb. 933, 943-44, 921 N.W.2d 89 (2018) (child's attendance at school indicative of significant connection under UCCJEA); *In re T.B.*, 497 S.W.3d 640, 645-46 (Tex. App. 2016) (child's attendance at school "factor" showing more than mere presence in state); *Amidon v. Clark*, No. 353888, 2021 WL 935687, at *3 (Mich. App. 2021) (unpublished opinion) (enrollment in school indicative of significant connection); *Hansen v. Hansen*, No. A19-1779, 2020 WL 3494334, at *4 (Minn. App. 2020) (unpublished opinion) (child's attendance at preschool indicates significant connection). And that intent remained intact when the petition was filed about two months later.

There is additional evidence that S.C. and her family had a significant connection with Kansas that went beyond mere presence. At the termination hearing, Father testified that a key component under Missouri DSS's safety plan was that S.C. and her brother must live separately. But while the family stayed in Missouri, the safety plan was not feasible because Father's grandmother was no longer able to separately care for S.C.'s brother. As such, moving the family back to Kansas ensured that S.C. would live apart from her brother. Father testified why living in Kansas was important for the family: "I had to move somewhere that was going to be beneficial to both kids to remain separated." He chose to move to Garden City where their family lived, including S.C.'s biological mother. This allowed S.C.'s brother to live with his mother and S.C. to live with Father. Still, at the time of the reported offense, S.C.'s brother was apparently living with Father's family, including S.C. Even so, according to Father, living in Kansas provided an important means to properly follow the safety plan for S.C., thereby safeguarding S.C. As such, the nature and quality of S.C.'s contacts with her family living in Kansas shows the first factor is met. We move to the next factor.

Second, we consider whether substantial evidence is available in Kansas concerning the child's care, protection, training, and personal relationships. K.S.A. 23-37,201(a)(2)(B). Here, the Kansas district court had access to ample information concerning S.C.'s care, safety, education, and personal relationships. At the termination hearing, Father testified how he had met with Missouri DSS before leaving Missouri and that a DSS worker "was going to transfer everything to the State of Kansas to the local DCF office here[.]" This included the family's DSS reports and the Missouri DSS-prepared safety plan for S.C. and her family. The safety plan also referenced S.C.'s mental health, requiring therapy services for both S.C. and her brother. Father recalled: "[The Missouri DSS worker] told me that she was going to forward the safety plan and the case over to Kansas to where it could be made sure I was following the recommendations, and to give me the support that I needed to get the services if I needed any help." Upon receipt of the referral from the Missouri DSS, DCF was to contact Father. In fact, the State's CINC petition stated that because the family resided in Finney County, the Finney County Sheriff's Office had also received the Missouri DSS reports regarding S.C.

The district court also would be able to review the DCF information regarding Father and the family *before and after* S.C. was born in Kansas. During the years from 2011 through 2014, DCF had been involved with the family when they lived in Garden City. And before the petition was filed, DCF had filed a referral for S.C. to be removed from her parents' custody.

Further, because S.C. was attending school in Kansas at the time the petition was filed, the court would have access to S.C.'s school records. This includes records regarding her education and care through her teachers and counselors, including the counselor who reported the incident between S.C. and her brother. In addition to S.C.'s teachers and counselors, several other Kansas parties familiar with S.C. would have been available to the court—most notably her family members, DCF workers, the Finney

17

County Sheriff's Office, and the investigating law enforcement officer from the Garden City Police Department.

Thus, at the time the CINC petition was filed, the district court had access to the following documents: (1) the Missouri DSS reports regarding S.C. and her family from 2015-2019; (2) Missouri DSS's safety plan for S.C. and the family; (3) DCF reports dating from 2011-2014, which includes the first year of S.C.'s birth; (4) DCF's 2019 referral report regarding removing S.C. from the custody of her parents; (5) Garden City grade school reports from teachers and/or counselors regarding S.C.; and (6) local Kansas law enforcement reports. Given the amount of information available to the court when the petition was filed, substantial evidence existed showing S.C.'s significant connection to Kansas. The second factor is also met.

To conclude, we find that S.C. had a significant connection with Kansas at the time the petition was filed due to (A) S.C. and her parents having a significant connection with Kansas other than mere physical presence; and (B) substantial evidence available to the Kansas district court concerning S.C.'s care, protection, and training, i.e., S.C.'s education and personal relationships.

Our decision that Kansas has significant connection jurisdiction essentially agrees with the State's and the GAL's arguments. However, their arguments differ in that they contend that the court first exercised the UCCJEA's temporary emergency jurisdiction per K.S.A. 23-37,204(a) before "ripening" to significant connection jurisdiction under K.S.A. 23-37,201(a)(2). In support, the State cites to *In re K.L.B.*, 56 Kan. App. 2d at 444.

In considering emergency circumstances, a district court may obtain temporary emergency jurisdiction when "it is necessary in an emergency to protect the child because the child . . . is subjected to or threatened with mistreatment or abuse," and the child is present in Kansas. K.S.A. 23-37,204(a). "An emergency is '[a] serious situation or

18

occurrence that happens unexpectedly and demands immediate action.'" *In re A.A.*, 51 Kan. App. 2d at 807. And the "UCCJEA omits the 'child in need of care' basis for emergency jurisdiction and clearly provides only limited emergency jurisdiction." 51 Kan. App. 2d at 807 (citing K.S.A. 2014 Supp. 23-37,204[a]).

A crucial aspect of emergency jurisdiction granted by the UCCJEA is that it is limited and temporary in nature. 51 Kan. App. 2d at 806-07. While a district court may have temporary emergency jurisdiction, this is "meant to be 'very limited [in] scope and to be reserved for extraordinary circumstances.'" 51 Kan. App. 2d at 807 (noting that a "child-in-need-of-care finding by itself does not invoke emergency jurisdiction under the UCCJEA").

In this case, the State's petition stated that the court had "jurisdiction to make a child custody determination pursuant to K.S.A. 23-37,204(a)." Yet the court's Journal Entry and Order of Temporary Custody did not specifically indicate that it was exercising temporary emergency jurisdiction under K.S.A. 23-37,204. For instance, in its written Journal Entry and Order of Temporary Custody, the district court only stated: "An emergency exists whereby it is contrary to the best interest of the child to return home at this time." Even in the court's own handwritten orders, the court made no indication it was exercising temporary emergency jurisdiction under the UCCJEA. And the court did not suggest that it was contacting Missouri to confirm jurisdiction as outlined under the UCCJEA. See K.S.A. 23-37,204(b)-(d). The two court documents indicate that the court only entered standard orders. See *In re K.L.B.*, 56 Kan. App. 2d at 442 (Kansas court was aware of a potential jurisdictional issue and ordered the district attorney's office to contact the appropriate Kentucky court following the temporary custody hearing).

In sum, we find S.C. had a significant connection with Kansas under K.S.A. 23-37,201(a)(2). Having satisfied that Kansas has jurisdiction, we need not consider whether

the court has jurisdiction under the remaining two bases, namely, more appropriate forum and default or vacuum jurisdiction. See K.S.A. 23-37,201(a)(3) and (a)(4).

*Conclusion*

When the UCCJEA statutory requirements are fulfilled, the Code allows Kansas courts to make an initial child custody determination. Here, Kansas does have significant connection jurisdiction under K.S.A. 23-37,201(a)(2). The district court thus had initial child custody jurisdiction enabling it to issue permanent orders of child custody for S.C., including terminating Father's parental rights.

## II. THE DISTRICT COURT DID NOT DENY FATHER'S RIGHT TO DUE PROCESS

Father alleges the 11-month gap between the filing of the motion to terminate his parental rights and the hearing on that motion violated his procedural due process rights. Father notably did not make this argument to the district court.

"[C]onstitutional grounds for reversal cannot be raised for the first time on appeal." *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 729, 317 P.3d 70 (2014). There are several exceptions to this general rule, including: "'"(1) the newly asserted theory involves only a question of law arising on proved or admitted facts . . . ; (2) consideration of the theory is necessary to serve the ends of justice or to prevent [a] denial of fundamental rights"; or (3) the district court's judgment is correct for the wrong reason.' [Citation omitted.]" *In re A.S.*, 319 Kan. at 399.

"If the issue was not raised below," an appellant must provide "an explanation why the issue is properly before the court." Rule 6.02(a)(5) (2024 Kan. S. Ct. R. at 36). While Father fails to provide such an explanation, he does assert that his fundamental liberty

20

rights as a parent are at issue, which falls under the second exception. Even so, our review of the issue finds that Father's due process rights were not violated.

*Standard of Review*

"'Whether a right to due process has been violated is a question of law, over which an appellate court exercises unlimited review.'" *In re K.E.*, 294 Kan. 17, 22, 272 P.3d 28 (2012).

*Analysis*

When a court receives a "petition or motion requesting termination of parental rights . . . , the court shall set the time and place for the hearing, which shall be held within 90 days. A continuance shall be granted only if the court finds it is in the best interests of the child." K.S.A. 38-2267(a). The State filed the motion for termination of parental rights on July 19, 2022. On August 8, 2022, the matter was continued for a district judge to be assigned. On October 11, 2022, the district court set a pretrial hearing for December 22, 2022, and the termination hearing for January 25, 2023. There were no objections noted. On January 25, 2023, the district court continued the termination hearing to June 14 and 15, 2023. A review of the record shows that Father did not object to any continuances.

*A due process analysis under* Mathews v. Eldridge

When the State seeks to terminate the relationship between a parent and child, it must do so by "fundamentally fair procedures" that meet the requisites of due process. *Santosky v. Kramer*, 455 U.S. 745, 753-54, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). To establish that his due process rights were violated, Father must show that he was "both

21

entitled to and denied a specific procedural protection." *In re A.A.-F.*, 310 Kan. at 145. When considering the procedural protection requirements, a court weighs

> "(1) the individual interest at stake; (2) the risk of erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and (3) the State's interest in the procedures used, including the fiscal and administrative burdens that any additional or substitute procedures would entail." *In re J.D.C.*, 284 Kan. 155, 166-67, 159 P.3d 974 (2007).

The historic United States Supreme Court case, *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), established these three factors.

Beginning with the first factor, Father, as the parent to S.C., has a fundamental liberty interest in the right to make decisions about S.C.'s care, custody, and control. See *In re J.D.C.*, 284 Kan. at 166. Father does have rights at stake because the 11-month period from when the State filed the motion to terminate his parental rights and the parental termination hearing involves his ability to parent his child.

The second factor—the risk of erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards—is not present. Father does not claim that he was unable to present evidence and argument at the termination hearing, or that he was otherwise "unheard." He argues that the delay "remove[d] his ability to parent his child" because the visitation schedule with S.C. was reduced after the finding that reintegration was no longer viable.

The State counters that the added time between the motion and the hearing was to Father's benefit "because he could have used the time to address the issues with reintegration and his parenting, which he did not do." The State also points out that Father never motioned the court to modify the visitation schedule for additional visits.

22

Father's argument is against the visitation schedule, which is not subject to appeal. See K.S.A. 38-2273(a) (limiting appeals to orders of temporary custody, adjudication, disposition, finding of unfitness, or termination of parental rights). He argues that delay "keep[s] a child from attaining permanency." This is not an argument that his rights were violated but an attempt to argue the merits of the termination. Father, moreover, cites no authority for his contention that a delay between the filing of the motion to terminate and the termination hearing is a due process violation. A failure to support a point with pertinent authority or failure to show why a point is sound despite a lack of supporting authority or in the face of contrary authority is like failing to brief the issue. *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018). A point raised incidentally in a brief and not argued therein is deemed waived or abandoned. *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017).

The third factor—the State's interest in the procedures used, including the fiscal and administrative burdens, support a finding that Father's due process rights were not violated. The State has an interest in seeing that a CINC case proceeds in a timely and proper manner. This includes—when necessary—the appointment of a district court judge to hear a parental termination hearing. In this case, a new judge was appointed to preside over the termination hearing. Given that appointment, and the later continuance, the timeframe here was reasonable under the circumstances.

A similar argument was made in *In re B.H.*, 32 Kan. App. 2d 12, 80 P.3d 396 (2003). There, a father alleged he was denied his right to parent his children between removal of the children and termination of his parental rights. The panel held that the father's due process rights were not violated. It stated: "The language regarding time limitations for dispositions of a child in need of care case stated in K.S.A. 38-1561 and K.S.A. 38-1561(c) is directory, not mandatory." 32 Kan. App. 2d at 16. While K.S.A. 38-1561 was repealed, it required a hearing on a motion for termination of parental rights within 90 days of the date the motion was filed, just as K.S.A. 38-2267 does today. See

23

also *In re K.D.B.*, No. 116,278, 2017 WL 3001033, at *3 (Kan. App. 2017) (unpublished opinion) (finding a "generic allegation of prejudice doesn't legally establish actual prejudice" where "[n]either parent has shown that the delay [in conducting an adjudication hearing] deprived him or her of access to specific relevant evidence").

Our Kansas Supreme Court has stated that "failure to follow a statutorily required process does not inevitably result in a due process violation." *In re A.A.-F.*, 310 Kan. at 146-47. There, our highest state court found no constitutional due process violation when the district court did not hold a statutorily mandated permanency hearing within 30 days of finding reintegration was no longer viable. 310 Kan. at 149.

Father had notice of the hearing to terminate his parental rights; he was present and fully represented at the termination hearing. He also had a chance to be heard. Moreover, Father never objected to the continuances of the termination hearing in the district court on due process grounds or for any other reason. The delay did not create a risk that he would be erroneously deprived of his parental interests. See *In re A.A.-F.*, 310 Kan. at 147. Father's due process rights were not violated.

Finally, in *In re A.A.-F.*, after the Kansas Supreme Court ruled that the parent had failed to show a constitutional due process violation due to the untimely permanency hearing, our highest court clarified that such delays are not preferable and are discouraged: "Other facts may lead to a different holding, and, knowing that, we are confident Kansas district courts will not read our conclusion that the failure to comply with a statutory requirement in this case did not violate constitutional due process as a license to ignore K.S.A. 2015 Supp. 38-2264(e)." 310 Kan. at 149. Likewise, this holding is limited to this case—that is, under the facts of this case, Father did not establish a constitutional violation. We therefore echo the Supreme Court's clarification that courts should not read our holding that courts are permitted to ignore CINC statutory requirements.

III. THE DISTRICT COURT DID NOT ERR IN TERMINATING FATHER'S PARENTAL RIGHTS

*Standard of Review*

When a child has been adjudicated a CINC, the court may terminate parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a). Accordingly, termination of parental rights "will be upheld on appeal if, after reviewing all the evidence in the light most favorable to the prevailing party, the district judge's fact-findings are deemed highly probable, i.e., supported by clear and convincing evidence." *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020). In making this determination, "the appellate court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

*Additional Facts*

The State's first witness at the termination hearing was Fulton, who conducted the initial forensic interview of S.C. on December 6, 2019. During the interview, S.C. told Fulton that she lived in a house with Mother, Father, a grandma and grandpa, and four older brothers. S.C. disclosed details of one of her older brother's sexual abuse. S.C. stated on an anatomical diagram that when she used the term "pee-pee," she meant a boy's penis and a girl's vagina. S.C. also told Fulton that her father told her not to tell anyone about what her brother did to her.

The State's next witness was Barnett, who performed a psychological evaluation with parenting emphasis on Father on March 11, 2021. Barnett's recommendations were

25

that reintegration with S.C. was "not likely to be successful." Barnett testified that Father believed S.C.'s mother "had coached her into saying that [Brother] had perpetrated on her" and that Father "didn't believe that it happened." Barnett testified that Father admitted there were "a couple of incidents of domestic violence" between himself and his ex-wives that the children had witnessed. Barnett testified that Father "does some therapy on a surface level, but he's not really dealing with the real issues that brought the children into custody to begin with." She also testified that Father was "kicked out of a parenting class because they said he was acting out sexually."

Among Barnett's concerns were Father's blaming of others and inability to take responsibility for his children's wellbeing and safety. Father was diagnosed with generalized anxiety and major depressive disorder. Barnett reported that "his judgment was poor and his insight was lacking. He does not have a lot of insight into his own functioning, as well as what his children need, and he has a history of making poor decisions." Barnett testified that Father had a history of blaming others, avoiding talking about trauma, and running from his problems. She stated, "[H]e wasn't really accountable for his own behavior and his own culpability as the father of these children and what had been going on."

Barnett testified that she knew that Missouri had opened a case on this family before their relocation to Kansas. She read a portion of the report that she received from Missouri's DSS, dated March 17, 2020:

> "'DSS determined [Brother] had sexually abused [S.C.] and the two brothers not involved in this evaluation. There was a great concern about a continuing cycle of sexual abuse with this family on May 18, 2020. Because the family had relocated to Kansas, Missouri DSS determined not to open a family-centered services case.'"

26

Barnett testified that the family moved to Kansas in September 2019; at that time they were supposed to be using a safety plan implemented in Missouri, but they failed to comply with it. "The safety plan was put in place to keep [Brother] and [S.C.] apart from each other so that there was no more . . . sexual abuse." Barnett had information from Missouri DSS that Father drove to Kansas with Brother and S.C. together, and they all stayed overnight together in a motel, which violated the safety plan.

Barnett's testimony also included reading from a Missouri DSS report about an incident on September 12, 2019:

> "'DSS met with [Father], [Brother], and the Columbia police with regard to exposing his genitals to [S.C.]. It was agreed [Brother] would enter residential treatment. [Father] admitted he could not provide for the safety of his children. The previous night 911 was called because [Brother] was chasing his grandmother with a stick.'"

Brother was never admitted to residential treatment. Rather than completing services in Missouri, Father decided to move out of state to Kansas. Barnett expressed concern that Father told her he was intending to relocate out of Kansas as soon as S.C. came home, as she believed he was planning to do so in order to avoid consequences.

Barnett testified to her conclusion that "reintegration was not a feasible option, mostly because [Father] had not shown any progress in addressing his personal issues that were actually reinforcing what the children were doing." Barnett's ultimate finding was that Father did not have the parenting skills necessary to provide for the safety and wellbeing of S.C.

Next the State called Jones, a licensed clinical marriage and family therapist and a registered play therapist with High Plains Mental Health Center. Jones provided therapy for S.C. for over two years. S.C. was diagnosed with "other reactions to severe stress,"

27

which "is a diagnosis that [is used] when someone does not meet complete or full criteria for PTSD, but has many traits or symptoms of that trauma diagnosis." S.C. has also been diagnosed with attention deficit hyperactivity disorder (ADHD). During therapy, S.C. disclosed other incidents where her brother had touched her inappropriately. Jones testified, "Research has shown that actually a parent knowing and failing to protect, or a parent denying that it occurred, can actually be more harmful to the child than the actual act of abuse itself." Jones testified that S.C. would regress if placed back into Father's home. Jones stated that returning S.C. to Father's home could be potentially harmful for S.C.

The State next called Mai, who visited S.C. monthly and supervised the visits between S.C. and Father. Those supervised visits were two hours each, twice a month in the SFM office. Mai testified that Father's behavior had been consistent over the last two years of visits—"He comes in, they greet each other, he brings fast food, they watch a movie on his phone. The conversation is very limited; usually it's just watching a movie in silence for at least an hour." The fact that Father largely remained silent during visits was concerning to Mai. She testified, "There's a lack of bond between them." Mai also testified as to why Father's supervised visits had not progressed to unsupervised visits. She said the concern was a risk that Father was not able to keep S.C. safe considering he does not acknowledge that sexual abuse occurred. In fact, his visits decreased from weekly to twice a month. Mai also testified to inappropriate acts during the visits. At one point, S.C. asked Father "to tickle her in her private part." S.C. was overly affectionate, sitting on his lap for extended periods, laying on him, and once tried to lick him.

Father did complete some case plan tasks. Mai testified that he completed a mental health assessment and the fatherhood initiative class. Father participated in one IEP meeting at the school. Although Father was successfully discharged from individual therapy, he continued not to hold himself accountable for the sexual abuse that occurred in his household. Mai testified to SFM's conclusion:

"'St. Francis has had time to access the allegations and address the concerns with the family. [S.C.] has been out of home since December 11, 2019. Due to the circumstances of the case and the overall wellbeing of the child, reintegration has not occurred. The likelihood of it changing in the near future for either parent is unlikely. [Father] continues to take no accountability in the abuse that occurred in his household.

"'St. Francis Ministries continues to be concerned about the abuse that occurred in [Father's] care and his ability to protect his children from . . . future abuse. The children removed from [Father's] care have been sexually or had some form of abuse at one point in their lives while in his care.'"

Mai's recommendation was to terminate Father's parental rights.

The State next called Quint, who served as a SFM case manager over this case for its entire duration, since 2019. She testified that it has been SFM's recommendation to terminate Father's parental rights since January 24, 2022. Quint reiterated Father's lack of accountability and refusal to acknowledge the sexual abuse that took place. Quint testified that Father was admitted into Larned State Hospital from April 17 to April 21, 2020. Father told Quint on the phone that "he emotionally lost it and needed a break from the kids."

Quint testified that Father completed several parenting classes but had to retake the fatherhood initiative class because the instructor believed Father was actively using drugs, displaying behaviors that were disruptive. Quint clarified that completing a parenting class consisted only of attending the sessions, not being tested for knowledge or skills. She agreed that she did not believe Father "actually learned and assimilated the skills that have been presented to him."

When asked what interactions Father has had with S.C. that give her concern about allowing unsupervised visits, Quint testified: "We have been involved with numerous . . . CINC matters. We've noticed that there's a difference in treatment between

one child and the other. There is multiple DCF investigations during the duration of the case . . . and as recent as . . . December 2022, [S.C.] asked for us to be in the room." Quint listed specific safety concerns that SFM had that justified keeping visitation supervised, including lack of boundaries and S.C.'s behavior after visits, as well as S.C.'s request that SFM be in the room during visits. Quint testified that SFM talked to Father about limiting electronic use during his visits with S.C., but that he continued to have S.C. watch a movie on his phone at every visit within the last year. Father had fallen asleep on more than 10 visits.

Quint testified that early in the case Father had two positive drug tests, one in January 2020 and one in March 2020. After that, his tests were negative for controlled substances. Quint testified that based on the case plan, Father has not demonstrated the ability to ensure S.C. goes to therapy and to take care of S.C.'s other needs. Quint recommended termination because S.C. has been out of the home since 2019 and deserves permanency. The State then rested its case.

Father, Father's mother, Father's current wife, and S.C. all testified on behalf of Father. Father testified that there were two prior sexual occurrences between Brother and S.C. while they lived in Missouri, before relocating to Kansas in September 2019.

Father denied violating the safety plan that was instituted in Missouri. He continued to deny that any incidents of a sexual nature between the children occurred in Kansas, even though S.C. told a school counselor and the forensic interviewer while she lived in Kansas that she lived in a house with her brother and that he touched her inappropriately there the previous week. Father further denied telling S.C. not to tell anyone about the incident. He also stated that he had been in Larned State Hospital for three to four days but denied having any symptoms of suicidal ideation or anxiety at that time. He testified that the only reason he was admitted to the hospital was because his ex-wife told the doctors he was suicidal.

30

Father denied that S.C. ever asked him to tickle her private part. He claimed that S.C. only asked him why he did not tickle her anymore and he told her that SFM would not "deem it to be appropriate." Father admitted that S.C. once tried to lick his arm but said he pulled away and told her it was inappropriate and not to do it again. Father also denied ever sleeping in the same bed as S.C., much less removing her clothing.

Father claimed that during visits with S.C. he would provide activities like card games, board games, coloring books, and activity books with reading, math, or spelling to work on. He acknowledged there were times that they would watch movies or shows on his phone. He admitted that he may have dozed off a couple of times during visits but denied ever being in a deep sleep. Additionally, he denied being unsuccessfully discharged from a parenting class for exhibiting "erotic behaviors during class." He testified that he was told that he was being kicked out for having a positive drug test.

When asked why he indicated to SFM that he would leave Kansas if reintegrated with S.C., Father testified, "To where we can move on with our life. To move past it, to be better, to be happy." Moving the family from Missouri to Kansas and Kansas to Missouri to avoid consequences was a concern to SFM and Barnett. When asked why he moved out of Missouri right after the initial incidents between S.C. and Brother, Father testified that it was because "Missouri wasn't willing to help me find a cheaper place [to live] like they was saying that they would." But he added that the reason for moving to Kansas was to "separate my children to where I could get the services that they both needed to where they could reintegrate back in the same home."

Additionally, when asked why he did not send Brother to live with his biological mother and keep S.C. and the rest of the family in Missouri, Father responded that he did not know how to get in touch with Brother's biological mother. But he added that the reason he moved the family to Kansas was so Brother could live with his biological mother. According to the Missouri DSS reports that Barnett referenced in her

31

psychological evaluation, Father stated to DSS his reason for moving to Kansas was that he feared losing the children. Ultimately, his testimony explaining his decision to move the family from Missouri to Kansas was inconsistent and confusing.

S.C. testified that she likes visits with Father very much and that "they're pretty fun." When asked what kind of activities she does with Father on their visits, S.C. testified, "We play games, we eat, we watch a movie together. That's really all." She testified that Father has brought games and books to their visits. S.C. also testified that she likes her foster parents very much. She stated that she wants to live with her father and brothers but also with the foster family.

After hearing all the evidence, the district court stated on the record, "This case, [notwithstanding] the history, was brought because of sexual abuse . . . that happened to [S.C.] by [Brother.] It happened. That's been established. . . . My biggest problem throughout these proceedings is that [Father] didn't believe it then and he doesn't believe it now." The court also stated:  "[Father] has made progress on the tasks that have been assigned to him, but yet, after 3 and a half years, there are still concerns from all the professionals involved in this case." Finally, the district court concluded:

> "Dad hasn't done enough to progress anymore than where we're at after 3 and a half years of [S.C.]'s life being spent in the system. . . . [T]he State has met its burden, that beyond the clear and convincing evidence that it is in the best interest of [S.C.] to have her parental rights to . . . her father . . . terminated."

*Analysis*

A parent has a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution to decide on the care, custody, and control of the parent's child. Before a parent can be deprived of the right to the custody, care, and

32

control of the child, the parent is entitled to due process of law. *In re P.R.*, 312 Kan. 767, 778, 480 P.3d 778 (2021); see *Troxel v. Granville*, 530 U.S. 57, 65-66, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000).

Under K.S.A. 38-2269(a), the State, as the moving party, must prove by clear and convincing evidence Father is "unfit by reason of conduct or condition" making him "unable to care properly for [his] child" and that the circumstances are "unlikely to change in the foreseeable future." The statute contains a nonexclusive list of nine conditions that singularly or in combination would amount to unfitness. K.S.A. 38-2269(b). And the statute lists four other factors to be considered if a parent no longer has physical custody of a child. K.S.A. 38-2269(c). The State may also rely on 1 or more of the 13 statutory presumptions of unfitness outlined in K.S.A. 38-2271(a).

The district court relied on six of the factors under K.S.A. 38-2269(b) in its decision to terminate the parental rights of Mother and Father. It is not clear which, if any, factors pertain solely to Father and which to Mother. But evidence of a clear and convincing nature as to any factor is enough to affirm termination. K.S.A. 38-2269(f). Of the factors the district court relied on, we review the following factors:

- K.S.A. 38-2269(b)(2): "conduct toward a child of a physically, emotionally or sexually cruel or abusive nature;"

- K.S.A. 38-2269(b)(4): "physical, mental or emotional abuse or neglect or sexual abuse of a child;" and

- K.S.A. 38-2269(b)(8): "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child[.]"

33

*K.S.A. 38-2269(b)(2)—conduct toward a child of a physically, emotionally, or sexually cruel or abusive nature*

The failure of a parent to "protect his or her child from abuse constitutes 'conduct toward a child of a physically, emotionally or sexually cruel or abusive nature' under K.S.A. 2008 Supp. 38-2269(b)(2)." *In re S.D.*, 41 Kan. App. 2d 780, Syl. ¶ 7, 788-90, 204 P.3d 1182 (2009) (upholding termination of parental rights under K.S.A. 38-2269[b][2]). Father's insistence that the abuse never happened—only admitting to two incidents that happened in Missouri and which did not specifically involve vaginal or anal penetration, despite S.C.'s disclosure to the contrary—is indicative of his failure to keep her safe.

Father argues on appeal that "he personally took care to follow the safety plans in Missouri, took steps to keep the children separate, and made corrective action for him as a parent." His testimony that he followed Missouri's safety plan was directly refuted at the termination hearing by Barnett, who had information from Missouri DSS that Father drove to Kansas with Brother and S.C. together, and they all stayed overnight together in a motel, which violated the safety plan. Additionally, S.C. had disclosed to a forensic interviewer that Brother sexually assaulted her at her current home, which was then Kansas. Father's continual denial of the sexual assault that happened under his care was of primary concern to the district court.

S.C.'s therapist testified that a parent's denial of events may cause more harm than the sexual assaults themselves. Barnett concluded that "reintegration was not a feasible option, mostly because [Father] had not shown any progress in addressing his personal issues that were actually reinforcing what the children were doing."

In *In re S.D.*, "mother's boyfriend allegedly battered S.D. and mother allegedly knew about the ongoing abuse and failed to protect the child." 41 Kan. App. 2d at 786.

Mother continued to allow the boyfriend in her home despite a no-contact order. 41 Kan. App. 2d at 783-84. Similarly, here, Father continued to allow Brother to have contact with S.C. and ignored the safety plan. He claims otherwise, but the district court believed S.C. and the professionals' versions over Father's, and this panel does not reweigh evidence or pass on the credibility of witnesses. *In re B.D.-Y.*, 286 Kan. at 705.

> *K.S.A. 38-2269(b)(4)—physical, mental, or emotional abuse or neglect or sexual abuse of a child*

A parent's refusal to admit that one child is sexually abusing another in his household also has been found to support termination on this statutory factor. In *In re N.W.*, No. 125,235, 2023 WL 1879330, at *7 (Kan. App. 2023) (unpublished opinion), the panel recognized that the father "did not personally perpetrate the sexual abuse but [found] that does not insulate him from accountability."

> "'Neglect' is defined as 'acts or omissions by a parent . . . resulting in harm to a child, or presenting a likelihood of harm.' 'Harm' is defined as 'physical or psychological injury or damage.'
>
> "Based on a plain reading of these definitions, a showing of emotional neglect requires either psychological injury to a child or actions or omissions by the parent which present a likelihood of psychological injury to the child. [Citations omitted.]" *In re J.W.*, No. 112,668, 2015 WL 8590309, at *8 (Kan. App. 2015) (unpublished opinion).

A review of the record shows there is clear and convincing evidence of S.C.'s psychological injury. S.C. was diagnosed with "other reactions to severe stress," which "is a diagnosis that [is used] when someone does not meet complete or full criteria for PTSD, but has many traits or symptoms of that trauma diagnosis." S.C.'s therapist testified that a parent knowing and failing to protect, or a parent denying that abuse occurred, can be "more harmful to the child than the actual act of abuse itself." When S.C. confronted Father about the abuse she received from Brother, Father told her not to

35

tell anyone. Viewing the evidence in a light most favorable to the State, a rational fact-finder could conclude it was highly probable that Father neglected S.C. emotionally.

*K.S.A. 38-2269(b)(8)—lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child*

As the State points out, Father did not follow the safety plan initiated by Missouri. Importantly, although the record reflects Father completed parenting classes, participated in a mental health assessment, and provided a three-bedroom home to keep S.C. separate from her brothers, Father never modified his behavior so that the visitations could move from supervised to unsupervised. And due to Father's lack of progress, the visitations decreased in frequency. The district court did not weigh the evidence of Father's completion of the parenting classes, participation in a mental health assessment, and housing in his favor. We do not reweigh conflicting evidence. *In re B.D.-Y.*, 286 Kan. at 705. Thus, the evidence in the record was sufficient to establish that Father demonstrated a lack of effort to adjust his circumstances, conduct, or condition to meet S.C.'s needs.

Based on the analysis of these three factors, there is enough evidence, viewed in the light most favorable to the State, to deem the district court's fact-findings highly probable and affirm the termination of Father's parental rights. See *In re Adoption of Baby Girl G.*, 311 Kan. at 806.

*Foreseeable Future*

Father does not contest that his unfitness was unlikely to change in the foreseeable future. We must "measure the 'foreseeable future' from the child's perspective, considering the child's perception of time. *In re R.S.*, 50 Kan. App. 2d 1105, 1117, 336 P.3d 903 (2014)." *In re Ch.W.*, No. 114,034, 2016 WL 556385, at *8 (Kan. App. 2016) (unpublished opinion); see K.S.A. 38-2201(b)(4).

36

Our review of the record supports the district court's finding. There was credible evidence that S.C. would be harmed if returned to Father's care. Father made no attempts to shield S.C. from further harm when she was in his care. Additionally, there was no evidence suggesting Father would change in the foreseeable future. Notably, the district court stated that in the three-and-a-half years since the CINC case began, Father made little to no progress. The court found that Father's behavior was not likely to change in the foreseeable future. We conclude that clear and convincing evidence supports the district court's determination that Father's unfitness is not likely to change in the foreseeable future.

*Best Interests of the Child*

If the district court finds the parent unfit, the court must then determine whether termination of parental rights is in the child's best interests. K.S.A. 38-2269(g)(1). A district court is in the best position to determine the best interests of a child, and the district court's judgment will not be disturbed on this point unless it has abused its discretion. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255 (2010). "Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *Unruh v. Purina Mills*, 289 Kan. 1185, 1202, 221 P.3d 1130 (2009).

Father does not contest that termination of his parental rights was not in S.C.'s best interests. At the conclusion of the termination hearing, the district court stated, "All the professionals in this matter have testified, and their reports indicate that none of them believe . . . that reintegration is in the best interest of [S.C.]." At the time of the termination hearing, S.C. had been out of Father's home for almost four years. We conclude that it was not an abuse of discretion for the district court to find that it was in S.C.'s best interests to remain in out-of-home placement with Father's rights terminated.

Affirmed.